Michael A. Caddell (SBN 249469)
mac@caddellchapman.com
Cynthia B. Chapman (SBN 164471)
cbc@caddellchapman.com
Amy E. Tabor (SBN 297660)
aet@caddellchapman.com
CADDELL & CHAPMAN
628 East 9th Street
Houston TX 77007-1722
Tel.: (713) 751-0400
Fax: (713) 751-0906

Foster C. Johnson
fjohnson@azalaw.com (SBN 289055)
Joseph Ahmad (*pro hac vice forthcoming*)
jahmad@azalaw.com
Nathan Campbell (*pro hac vice forthcoming*)
ncampbell@azalaw.com
AHMAD, ZAVITSANOS, & MENSING, PLLC
1221 McKinney Street, Suite 2500
Houston TX 77010
Tel: (713) 655-1101
Fax: (713) 655-0062

*Attorneys for Plaintiff*

[Additional Counsel included on signature page.]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANE DOE, individually and on behalf of others similarly situated,<br><br>*Plaintiff,*<br><br>*v.*<br><br>THE COUNTY OF SANTA CLARA d/b/a SANTA CLARA VALLEY MEDICAL CENTER<br><br>*Defendant.* | CASE NO. 3:23-cv-04411-WHO<br><br>**FOURTH AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Jane Doe ("Plaintiff"), individually and on behalf of all other current California citizens similarly situated, brings suit against Defendant the County of Santa Clara d/b/a Santa Clara Valley Medical Center ("Santa Clara Valley Medical Center" or "Santa Clara"), and upon personal knowledge as to Plaintiff's own conduct and on information and belief as to all other matters based upon investigation by counsel, alleges as follows:

## I. SUMMARY OF ALLEGATIONS

1.    This case arises from Defendant's systematic violation of the medical privacy rights of patients and users of Defendant Santa Clara Valley Medical Center's services, exposing highly sensitive personal information to Facebook without those patients' or users' knowledge or consent.

2.    At all relevant times, Santa Clara Valley Medical Center disclosed information about prospective and actual patients—including their status as actual or potential patients, their actual or potential physicians, their actual or potential medical treatments, the hospitals they visited or may visit, and their personal identities—to Facebook, as well as Google and other third parties without their prospective or actual patients' knowledge, authorization, or consent.

3.    Santa Clara disclosed this protected health information through the deployment of various digital marketing and automatic software tools embedded in its website that purposefully and intentionally disclose Personal Health Information to Facebook, as well as Google and other third parties who exploit that information for advertising purposes. Santa Clara's use of these tools caused personally identifiable information and the contents of communications exchanged between actual and prospective patients with Santa Clara to be automatically redirected to Facebook, as well as Google and other third parties, in violation of those patients' reasonable expectations of privacy, their rights as patients, and their rights as citizens of California.

4.    Santa Clara's conduct in disclosing such protected health information to Facebook and Facebook's conduct in intercepting and exploiting the protected health information violate California law, including the California Invasion of Privacy Act ("CIPA"), CAL. PENAL CODE §§

630, et seq.; the California Confidentiality of Medical Information Act ("CMIA"), CAL. CIVIL CODE §§ 56.06, 56.10, 56.101; and the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), CAL. PENAL CODE § 502.

5.      Plaintiff continues to desire to search for health information on Santa Clara's websites as it is often her only means to seek and facilitate treatment.  Plaintiff will continue to suffer harm if the websites are not redesigned. If the websites were redesigned to comply with applicable laws, Plaintiff would use Santa Clara's websites to search for health information in the future.

6.      On behalf of herself and all similarly situated persons, Plaintiff seeks an order enjoining Defendant from further unauthorized disclosures of personal information; awarding statutory damages as allowed under law; actual damages; attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## II. PARTIES

### A. Plaintiff

7.      Plaintiff Jane Doe is a resident of Santa Clara County, California.

8.      Plaintiff Jane Doe has used Santa Clara Valley Medical Center's website and patient portal to search for doctors and medical treatment and to manage her treatment.

9.      Plaintiff Jane Doe's use of the Santa Clara Valley Medical Center's website entailed providing her sensitive medical information, such as conditions for which she was seeking treatment.

### B. Defendant

10.     Defendant County of Santa Clara is the managing agent for Santa Clara Valley Medical Center, which has its principal place of business at 751 S. Bascom Avenue, San Jose, CA 95128.  Santa Clara Valley Medical Center operates multiple hospitals and clinics, including Santa Clara Valley Medical Center, O'Connor Hospital, St. Louise Regional Hospital, Valley Health Center San Jose, Valley Health Center Sunnyvale, Valley Health Center Gilroy, and Valley

Health Center Milpitas.[1]  Santa Clara also owns and operates both a website and patient portal for its patients, which can be accessed at https://scvmc.scvh.org/home.

### III. JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 putative class members, and at least one Class Member is a citizen of a different state from Defendant.

12.     This Court has personal jurisdiction over Defendant Santa Clara Valley Medical Center because it regularly conducts business throughout California, including in Santa Clara County, and has its principal place of business in California.

13.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this district and because a substantial portion of the events and omissions giving rise to the claims occurred in this District.

### IV. COMPLIANCE WITH THE GOVERNMENT TORT CLAIMS ACT

14.     Prior to filing this complaint, Plaintiff complied with the government tort claims process set forth in Cal. Gov. Code §§ 810-996.6, et seq.

15.     On June 20, 2023, Plaintiff filed a written claim for damages against Defendant County of Santa Clara, asserting the privacy claims that are the subject of this lawsuit.

16.     On August 4, 2023, counsel for Defendant County of Santa Clara provided a Notice of Rejection of Claim letter to Plaintiff rejecting Plaintiff's claims.

### V. FACTUAL BACKGROUND

17.     Santa Clara Valley Medical Center's website and patient portal allows patients like Plaintiff to facilitate all aspects of their care with Santa Clara, allowing them to find doctors, research treatments, access medical records, pay bills, access its patient portal, view lab results,

---

[1] https://scvmc.scvh.org/home

and refill prescriptions. Since 2018, Plaintiff has used Santa Clara's website and patient portal (Santa Clara's "Web Properties") for those purposes.

18.     Plaintiff is a longtime Facebook user, who has had an account with Facebook since 2009.

19.     Plaintiff has been a patient of Santa Clara Valley Medical Center since 2017. Plaintiff has regularly visited Santa Clara Valley Medical Center's website and patient portal since 2018 at https://scvmc.scvh.org.  She used Santa Clara's website typically once a month to search for treatments for her conditions, including cirrhosis of liver and ascites, generalized anxiety disorder, migraines, and carpal tunnel syndrome.  That research revealed treatments and tests for those conditions and others, including psychiatric treatment, physical therapy, and pain management.

20.     Plaintiff has been using the Santa Clara Valley patient portal snice 2017.  Plaintiff has used the patient portal to access her lab results, schedule doctor's appointments, refill prescriptions, and communicate with her doctors. During her interactions inside the patient portal, Plaintiff entered sensitive medical information relating to her endometriosis, pelvic floor disorder, and menopause issues into the patient portal. On information and belief, Santa Clara installed tracking pixels inside its patient portal that surreptitiously forward patient interactions to third parties, including Google.  Every time that Plaintiff interacted with Santa Clara's patient portal, Santa Clara caused her sensitive medical information to be shared with third parties, including information such as her IP address and browser fingerprint that could be used to personally identify her.

21.     Plaintiff has also used Santa Clara's patient portal to make appointments with a gynecologist for treatment related to endometriosis, pelvic floor disorder, and menopause issues. On information and belief, whenever Plaintiff made such appointments, tracking pixels inside the portal caused details about those appointments to be shared with third parties, including Google.

22.     Plaintiff has also used Santa Clara's website and patient portal to make appointments with a psychologist for treatment related to post-traumatic stress disorder, panic attacks, and a personality disorder.

23.     Plaintiff has also used Santa Clara's website to order medications for women's health issues, including endometriosis, as well as for pancreatitis, asthma, fibromyalgia, and pain management.

24.     Between January 1, 2023, and June 30, 2023, Plaintiff used Santa Clara's patient portal to view test results regarding testing for undiagnosed seizures, as well as bone density scans, scans related to arthritis, an endoscopy, an ultrasound of her liver, and an MRI of her brain.

25.     In June 2023, Plaintiff used the "Find a Provider" function on Santa Clara's website to locate a neurologist.

26.     Unbeknownst to Plaintiff Jane Doe, Santa Clara had embedded source code on its website that took every search term she entered and every page of the site she visited and sent that information directly to Facebook and Google, the largest and most profitable social media companies on the planet. Santa Clara accomplished this by installing Facebook's "Meta Pixel" tool and Google's Google Analytics pixel on almost every page of Santa Clara Valley Medical Center's website. These tracking tools worked like a listening device. Each time Plaintiff Jane Doe typed a search term, these tracking pixels recorded the information she entered and transmitted it to Facebook and Google, along with identifying information that let Facebook and Google know exactly who Jane Doe was and the conditions for which Plaintiff was seeking medical treatment.

27.     For example, Santa Clara installed tracking pixels on the search box it makes available to patients on its website:



28.      Plaintiff used the search box on the Santa Clara website to research her medical conditions, investigate treatment options, and locate doctors.  Examples of the searches that Plaintiff ran using the Santa Clara search box, include "neurologist," "Dr. Nimesh Shah," "OBGYN," "endometriosis," and "cervical uterine cancer." Every time that Plaintiff used the search box on Santa Clara's website, Santa Clara transmitted these search terms to Facebook and Google, along with other data that personally identified Plaintiff, such as her IP address, browser fingerprint, and Facebook ID.

29.       Santa Clara also installed tracking pixels on the "MYHEALTH ONLINE" button on its webpage that patients like Plaintiff used to navigate to the patient portal:



30.      Plaintiff clicked on the "MYHEALTH ONLINE" button every time that she used the Santa Clara website to navigate to the patient portal.  When she did, Santa Clara surreptitiously sent information to Facebook and Google confirming Plaintiff's patient status, including additional information such as her IP address, Facebook ID, and browser fingerprint that allowed Facebook and Google to identify her.

31.      Santa Clara also installed tracking pixels on the navigation  button to the login page           for           its           patient           portal,           located           at https://myhealthonline.sccgov.org/mychartprd/Authentication/Login?

32.    Plaintiff visited this page and clicked on the login button every time that she accessed the Santa Clara patient portal.  Every time that she visited the patient portal page, Santa Clara surreptitiously transmitted information about Plaintiff to Facebook and Google, including personally identifying information.  Every time that Plaintiff clicked on the login button to the patient portal, Santa Clara surreptitiously confirmed Plaintiff's patient status to Google, along with personally identifying information such as her IP address and browser fingerprint.

33.    Likewise, once inside the patient portal, Plaintiff used the messaging functionality inside the portal to send and receive emails from her doctors.  The messages that Plaintiff sent and received included information about Plaintiffs' sensitive medical issues, including treatment for a broken foot, cancer, blood work, OBGY/women's health issues, and scheduling surgeries with her gastrointestinal doctor. On information and belief, Santa Clara shared details about these communications with Facebook and Google, including details that permitted Facebook and Google to personally identify her.

34.    Santa Clara also offers a mobile app for download to the public via its website

located at https://myhealthonline.sccgov.org/mychartprd/Authentication/Login. Santa Clara incorporated Google Firebase Code into the mobile patient portal app that it offered the public.

35. Google Firebase Code is a free software development kit ("SDK") that Google offers to developers to help them build and monetize mobile applications. Google, however, uses this embedded code to surveil users on non-Google apps. Software libraries included within the Firebase SDK code enable Google to collect information such as a user's age bracket, gender, interests, device brand, device category, location, operating system, and other information regarding users' interactions with the app. Google Firebase code also allows Google to track text that users type into an app; track results of users' searches within an app; and track users' downloads of files within an app. Unbeknownst to patients, the installation of this code inside the Santa Clara patient portal app resulted in disclosures of patients' personal health information, including their patient status, whenever they logged into the app and used it for routine purposes such as reviewing medical records, checking lab results, and communicating with their doctors.

36. Facebook took the information it received via the Meta Pixel and added it to all of the other information it keeps about consumers, matching Plaintiff's interest in medical care with her Facebook profile, name, address, interests, and other websites she had visited. This information then became available for Facebook's advertisers to use when Facebook sold them targeted advertising services.

37. After using Santa Clara's patient portal and website, Plaintiff saw numerous advertisements in her Facebook feed for products and services related to the medical conditions for which she had entered data inside the patient portal, including advertisements for pain management. These advertisements included advertisements for medications for her various conditions, as well as solicitations to participate in research questionnaires, research studies, and clinical trials.

38. Plaintiff was surprised and troubled that information she believed she was communicating only to Santa Clara Valley Medical Center for the purpose of obtaining medical

treatment had been sent to Facebook, as well as Google and other third parties.   Plaintiff subsequently learned that thousands of Santa Clara's patients had similarly had their privacy rights violated. Most of these patients were likely not even aware of this privacy violation, much less able to hire counsel to stop the illegal conduct. Plaintiff therefore now brings these claims to correct Defendant's privacy violations and obtain relief for herself and thousands of similarly situated patients.

## VI. CLASS ACTION ALLEGATIONS

**A.  Santa Clara routinely disclosed the protected health information of patients and users of their services to Facebook.**

39.   Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

40.   Medical patients and those seeking medical treatment in California such as Plaintiff have a legal interest in preserving the confidentiality of their communications with health care providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Santa Clara Valley Medical Center without their express written consent and authorization.

41.   As a health care provider, Santa Clara Valley Medical Center has common-law and statutory duties to keep patient data, communications, diagnoses, and treatment information completely confidential unless authorized to make disclosures by the patient.

42.   Patients are aware of (and must be able to rely upon) the protections, obligations, and expectations provided by statutory, regulatory, and common law as well as the promises of confidentiality contained within the Hippocratic Oath.

43.   Santa Clara Valley Medical Center operates websites for current and prospective patients, including https://scvmc.scvh.org.

44.     Santa Clara's Web Properties are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues and treatment options, and joining support groups.

45.     Santa Clara encourages patients to use digital tools on its websites to seek and receive health care services.

46.     The home page of Santa Clara Valley Medical Center's website is designed for use by patients.  The homepage provides patients with tools to seek medical treatment, such as finding a doctor, researching services and treatments, and paying bills.

47.     Santa Clara also maintains a patient portal, which allows patients to make appointments, access medical records, view lab results, and exchange communications with health care providers.  On information and belief, source code on Santa Clara Valley Medical Center's website caused these communications to be intercepted and disclosed to multiple third parties.

48.     Santa Clara encourages patients to use digital tools on its websites to seek and receive health care services.  Plaintiff and Class Members provided their private information to Santa Clara's website with the reasonable understanding that Santa Clara would secure and preserve the confidentiality of that information.

49.     Plaintiff and Class Members exchanged numerous communications with Santa Clara Valley Medical Center.  Plaintiff's and Class Members' communications included logging in and out of patient portals, exchanging communications about doctors and health conditions, and using button functionality from Santa Clara's websites.

50.     Notwithstanding prospective and current patients' reasonable expectations of privacy and Santa Clara's legal duties of confidentiality Santa Clara disclosed (and continues to disclose) the contents of Plaintiff's and Class Members' communications and protected health information via automatic tracking mechanisms embedded in the websites operated by Santa Clara without patients' knowledge, authorization, or consent.   In doing so, Santa Clara systematically violated the medical privacy rights of Plaintiff and Class Members by causing the

unauthorized disclosure of their communications to be transmitted to Facebook, as well as Google and other third-party marketing companies.

51.  The private information provided by Plaintiff and Class Members has been—and likely will be—further disseminated to additional third parties.

52.  While Santa Clara intentionally incorporated the Meta Pixel into its website, Santa Clara never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications with Facebook. As a result, Plaintiff and Class Members were unaware that their private information was being surreptitiously transmitted to third parties, including Facebook, when they visited Santa Clara's website.

53.  By design, none of the tracking mechanisms employed by Santa Clara are visible to patients visiting Santa Clara's website.

54.  Santa Clara did not warn or otherwise disclose to Plaintiff and Class Members that Santa Clara bartered their confidential medical communications to Facebook, as well as Google and other third parties, for marketing purposes.

55.  Plaintiff and Class Members never consented, agreed, or otherwise authorized Santa Clara to disclose their confidential medical communications.

56.  Upon information and belief, Santa Clara disclosed and Facebook intercepted the following non-public private information:

a.  Plaintiff's and Class Members' status as patients;

b.  Plaintiff's and Class Members' communications with Santa Clara via its website;

c.  Plaintiff's and Class Members' use of Santa Clara's patient portal;

d.  Plaintiff's and Class Members' searches for information regarding specific medical conditions and treatments, their medical providers, and their physical location.

57.  Santa Clara interfered with Plaintiff's and Class Members' privacy rights when it implemented technology that surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members' confidential information to Facebook, as well as Google and other third parties.

58.     Santa Clara also breached its obligations to patients in multiple other ways, including (1) failing to obtain their consent to disclose their private information to Facebook and other third parties, (2) failing to adequately review its marketing programs and web-based technology to ensure its website was safe and secure, (3) failing to remove or disengage software code that was known and designed to share patients' private information with third parties, (4) failing to take steps to block the transmission of Plaintiff's and Class Members' private information to Facebook and other third-party advertising companies, (5) failing to warn Plaintiff and Class Members that Santa Clara was routinely bartering their private information to Facebook via the Meta Pixel, and (6) otherwise ignoring Santa Clara's common-law and statutory obligations to protect the confidentiality of patient's protected health information.

59.     Plaintiff and Class Members have suffered injury because of Defendant's conduct. Their injuries include invasion of privacy and the continued and ongoing risk of irreparable harm from the disclosure of their most sensitive and personal information.

**B.   The Nature of Santa Clara's Unauthorized Disclosure of Patients' Health Care Information**

60.     Santa Clara's disclosure of current and prospective patients' personal health information occurs because Santa Clara intentionally deploys source code on the websites it operates, which causes current and prospective patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to Facebook and other third parties.  The only purpose for deploying this source code was to share data about patients with Facebook and Google so that Santa Clara could obtain analytics and marketing benefits from those companies.

61.     By design, Facebook and other third parties receive and record the exact contents of these communications before the full response from Santa Clara has been rendered on the screen of the patient's or user's computer device and while the communication with Santa Clara remains ongoing.

62.     While the information captured and disclosed without permission may vary depending on the pixel(s) embedded, these "data packets" can be extensive, sending, for example, not just the name of a physician and field of medicine, but also the first name, the last name, email address, phone number and zip code and city of residence entered into the booking form. In addition, that data is linked to a specific internet protocol ("IP") address.

63.     The only reason for installing tracking pixels on a website is so that a web host like Santa Clara can share information with third parties like Facebook and Google.  Tracking pixels are designed to automatically share user information with third parties every time they are triggered.

64.     The Meta Pixel, for example, sends information to Facebook via scripts running in a person's internet browser so each data packet comes labeled with an IP address that can be used in combination with other data to identify an individual or household.

65.     In addition, if the person is (or recently has) logged into Facebook when they visit a particular website when a Meta Pixel is installed, some browsers will attach third-party cookies—another tracking mechanism—that allow Meta to link pixel data to specific Facebook accounts.

66.     The Meta Pixel allows Facebook to track people and the actions they take on websites.  When Meta Pixel is installed on a hospital website or patient portal like those maintained by Santa Clara, the information that Facebook receives may include such information as the patient's home address, their name, their search location, as well as their doctor's specialty, name, and gender. When combined with other information that Facebook receives via the Meta Pixel (such as Plaintiff's appointment information and information about the kinds of treatments that patients research on the hospital's website), Facebook learns about patients' past and future medical conditions, their past and future medical treatment, and when and where they are receiving treatment for those conditions.

67.     With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering Personal Health Information, like Facebook, implement workarounds that cannot be evaded by savvy users. Facebook's workaround is called Conversions API (CAPI).

68.     CAPI is an effective workaround because it does not intercept data communicated from the user's browser. Instead, Conversions API "is designed to create a direct connection between [Web hosts'] marketing data and [Facebook]."

69.     Communications between patients and hospital websites, using Conversions API are received by hospitals and sored on their servers before CAPI collects and sends the Personal Health Information contained in those communications directly from the hospitals to Facebook. Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

70.     While there is no way to confirm with certainty that a Web host like Santa Clara has implemented workarounds like CAPI without access to the host server, Facebook instructs companies to use the CAPI in addition to the Pixel and share the same events using both tools because such a redundant event setup allows website owners to share website events with Facebook that the pixel may lose. Thus, it is reasonable to infer that Facebook's customers who implement the Meta Pixel in accordance with Facebook's documentation will also implement the CAPI workaround.

71.     The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner.

72.     Thus, without any knowledge, authorization, or action by a user, a website owner like Santa Clara can use its source code to commandeer a user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to Facebook.

73.     For example, when Plaintiff or a Class Member accessed Santa Clara's website pages hosting the Meta Pixel, the Meta Pixel software directed their browsers to send a message to Facebook's servers.  The information that Santa Clara sent to Facebook included the private information that Plaintiff and Class Members communicated to Santa Clara's website, such as the type of medical appointment the patient made, the date, and the specific doctor the patient was seeing.  Such private information allows Facebook to determine that a specific patient was seeking a specific type of confidential medical treatment.  This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being treated for specific types of medical conditions, such as cancer.

74.     Websites like those maintained by Santa Clara are hosted by a computer server through which the businesses in charge of the website exchange and communicate with internet users via their web browsers.

75.     Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with internet users via a client device, such as a computer, tablet, or smart phone, via the client device's web browser.

76.     Web browsers are software applications that allow users to exchange electronic communications over the internet.

77.     Each exchange of an electronic communication over the internet consists of an HTTP request from a client device and an HTTP response from a server.  When a user types a URL into a web browser, for example, the URL is sent as an HTTP request to the server corresponding to the web address, and the server then returns an HTTP response that consists of a web page to render in the client device's web browser.

78.     In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies.  Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

79.     In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes.

80.     A web page consists primarily of "Markup" and "Source Code." The markup of a web page comprises the visible portion of that web page. Markup is displayed by a web browser in the form of words, paragraphs, images, and videos displayed on a users' device screen. The source code of a web page is a set of instructions that commands the browser to take certain actions, either when the web page loads or when a specified event triggers the code.

81.     For example, typing https://scvmc.scvh.org/home into a web browser sends an http request to Santa Clara's website, which returns a HTTP response in the form of the home page of Santa Clara's website:



82.     Source code is not visible on the client device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the client device's screen. Source code may also execute a host of other programmatic instructions, including commanding a web browser to send data transmissions in the form of HTTP requests to the website's server, or, as is the case with Santa Clara's website, to third parties via pixels.

83.     In addition to controlling a website's Markup, Source Code executes a host of other programmatic instructions and can command a website visitor's browser to send data

transmissions to third parties via pixels or web bugs,[2] effectively opening a spying window through which the webpage can funnel the visitor's data, actions, and communications to third parties, along with patients' personally identifiable information like their Facebook IDs.

84.     For example, Santa Clara's website includes software code that transmits HTTP requests *directly* to Facebook, including patients' private health information, every time a patient interacts with a page on its website.

85.     In essence, Santa Clara encourages its patients to use a tapped device, and once the Webpage is loaded into a patient's browser, the software-based wiretap is quietly waiting for private communications on the Webpage to trigger the tap, which intercepts those communications intended only for Santa Clara and transmits those communications to Facebook and other third parties.

86.     When a patient communicates with Santa Clara's website (whether by typing in a webpage, putting in a search, clicking on a hyperlink, logging into the Santa Clara Valley Medical Center patient portal or otherwise), Santa Clara causes some of that information to be transmitted to Facebook, as well as Google and other third parties, without the patient's knowledge or authorization.  The third parties to whom user data is transmitted and the content of communications redirected are typically procured by websites to track users' personally identifiable data and communications for marketing purposes—i.e., targeted advertising.

87.     The basic command that web browsers use to exchange data and user communications is called a GET request.[3] For example, when a patient types "heart failure treatment" into the search box on Santa Clara's website and hits 'Enter,' the patient's web browser makes a connection with the server for Santa Clara's website and sends the following request: "GET search/q=heart+failure+treatment."

---

[2] These pixels or web bugs are tiny image files that are invisible to website users. They are purposefully designed in this manner, or camouflaged, so that users remain unaware of them.
[3] https://www.w3schools.com/tags/ref_httpmethods.asp

88.     The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

89.     In response to receiving a GET or POST request, the server for the entity with which the user is exchanging communications, in this case Santa Clara's server, will send a set of instructions to the web-browser, commanding the browser with source code that (1) directs the browser on how to render the entity's response and, in many circumstances, (2) commands the browser to transmit personally identifiable data about the Internet user and re-direct the precise content of the user's GET or POST requests to various third parties.

90.     Unbeknownst to most users, however, the website's server may also transmit the user's communications to Facebook, as well as other third parties.  The Meta Pixel that Santa Clara installed on its website is programmed to manipulate user's browsers so that their communications with Santa Clara were automatically, contemporaneously, and surreptitiously sent to Facebook.  When Plaintiff and Class Members visited Santa Clara's website for the first time, the Meta Pixel source code that Santa Clara had installed on its website instructed Plaintiff's and Class Members' browsers to begin sending duplicate GET and POST requests to Facebook every time that Plaintiff and Class Members subsequently interacted with part of Santa Clara's website, such as browsing new pages, filling out forms, or entering search terms in a search box.

91.     The Meta Pixel was triggered each time Plaintiff and Class Members communicated with Santa Clara via Santa Clara's website or navigated to Santa Clara's patient portal. This resulted in Plaintiff's and Class Members' communications being intercepted, duplicated, and secretly transmitted to Facebook at the same time the communications (in the form of HTTP GET requests and HTTP POST requests) were transmitted to Santa Clara.

92.     In other words, as a result of the source code that Santa Clara installed on its website, *two* communications originate from a patient's browser once the patient initiates an

action on Santa Clara's website—one (as intended) sent to Santa Clara and a second (undetectable to patients like Plaintiff and Class Members) that was simultaneously sent to Facebook. Accordingly, at the same time Plaintiff's and Class Members' browsers sent communications to Santa Clara, a duplicate of those communications was simultaneously sent to Facebook as a result of the instructions that their browsers had previously received from Santa Clara's website.

93.     Given that the two communications are literally generated and sent at the same time, the duplication is occurring while the intended communications are in transit.  Effectively, it is as if Santa Clara planted a bugging device inside Plaintiff's and Class Members' telephones, so that when they placed a call, the bug simultaneously sent a radio signal to Facebook in the next room, allowing Facebook to listen in and record the call. In this way, Santa Clara aided Facebook to read, learn, and exploit the contents of Plaintiff's and Class Members' communications that they sent (and Santa Clara received) within the state of California.

94.     Google warns website developers and publishers that installing its ad tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google.[4]

95.     Worse, the Personal Health Information that Santa Clara's Meta Pixel sent to Facebook was sent alongside Plaintiff's and Class Members' Facebook IDs (c_user cookie or "FID") thereby allowing individual patients' communications with Santa Clara, and the Personal Health Information contained in those communications, to be linked to their unique Facebook accounts.

96.     A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily

---

[4] https://support.google.com/platformspolicy/answer/6156630?hl=en

use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

97.     Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

98.     In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

99.     Web bugs can be placed directly on a page by a web developer or can be funneled through a "tag manager" service to make the invisible tracking run more efficiently and to further obscure the third parties to whom the website transmits personally identifiable user data and re-directs the content of communications.

100.     On information and belief, Santa Clara deploys Google Tag Manager on its websites through an "iframe," a nested "frame" that exists within the Santa Clara's Web Properties, including inside Santa Clara's patient portal, that is, in reality, an invisible window through which Santa Clara funnels web bugs for third parties to secretly acquire the content of patient communications without any knowledge, consent, authorization, or further action of patients.

101.     By design, none of the tracking is visible to patients who visit Santa Clara's Web Properties.

102.     Once the initial connection is made between a user and a website, the communications commence and continue between the parties in a bilateral fashion until the user leaves the website.

103.     Unbeknownst to most users, the website's server may also transmit the user's communications to third parties. Indeed, Google warns website developers and publishers that

1    installing its ad tracking software on webpages employing GET requests will result in users'

2    personally identifiable information being disclosed to Google.[5]

3        104.    Third parties (such as Facebook and Google) use the information they receive to

4    track user data and communications for marketing purposes.

5        105.    These tracking pixels can collect dozens of data points about individual website

6    users who interact with a website. One of the world's most prevalent tracking pixels, called the

7    Meta Pixel, is provided by Facebook.

8        106.    A website developer who chooses to deploy third-party source code, like a tracking

9    pixel, on their website must include the third-party source code directly in their website for every

10   third party they wish to send user data and communications. This source code operates invisibly

11   in the background when users visit a site employing such code.

12       107.    More significantly, tracking pixels such as the Meta Pixel tool allow Santa Clara

13   and Facebook to secretly track, intercept, record, and transmit every patient communication made

14   on Santa Clara's website.  When patients visit Santa Clara's website, unbeknownst to them, the

15   web page displayed on the patient's browser includes the Meta Pixel as embedded code, which is

16   not visible to patients or other visitors to Santa Clara's website.  This code is triggered when a

17   patient or visitor interacts with the web page.  Each time the Meta Pixel is triggered, the software

18   code is executed and sends patients' private information directly to Facebook.

19       108.    The Meta Pixel and similar tracking pixels act like a physical wiretap on a phone.

20   Like a physical wiretap, pixels do not appear to alter the function of the communication device

21   on which they are surreptitiously installed.  Instead, these pixels lie in wait until they are triggered

22   by an event, at which time they effectively open a channel through the website that funnels data

23   about users and their actions to third parties via a hidden HTTP request that is never shown to or

24   agreed to by the user.

25

26

27   _____
     [5] https://support.google.com/platformspolicy/answer/6156630?hl=en

28

109.    For example, a patient can trigger an HTTP request by interacting with the search bar on Santa Clara's website by typing a term such as "pregnancy" into the search bar and then hitting enter.  Santa Clara's server in turn sends an HTTP response, which results in the search results being displayed.

110.    This is not the only HTTP request, however, that is created by a patient's interaction with Santa Clara's website.  In fact, at the very same time the web page is instructed to send an HTTP request to Santa Clara requesting search results, the source code, acting as a tap, is triggered, such that Santa Clara's website is also instructed to send an HTTP request directly to Facebook, as well as Google, and other third parties, informing them of the patient's exact search and the patient's identifiable information.

**C.  Tracking pixels provide third parties with a trove of personally identifiable information.**

111.    Tracking pixels are especially pernicious because they result in the disclosure of personally identifiable information.

112.    For example, an IP address is a number that identifies a computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[6]

113.    Because of their uniquely identifying character, IP addresses are considered protected personally identifiable information. 45 CFR § 164.514.  Tracking pixels can (and typically do) collect website visitors' IP addresses.

114.    HIPAA further provides that information is personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination

---

[6] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

115.   Consequently, Santa Clara's disclosure of Plaintiff's and Class Members' IP addresses violated HIPAA and industry-wide privacy standards.

116.   Likewise, internet cookies also provide personally identifiable information.

117.   In the early years of the internet, advertising on websites followed the same model as traditional newspapers.  Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early internet paid for ads to be placed on specific web pages based on the type of content displayed.

118.   Computer programmers eventually developed 'cookies'—small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server.  Eventually some cookies were designed to acquire and record an individual internet user's communications and activities on websites across the internet.

119.   Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies.  These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history.  To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers.

120.   Cookies are considered personal identifiers.  45 CFR § 164.514.  Tracking pixels can collect cookies from website visitors.

121.   In general, cookies are categorized by (1) duration and (2) party.

122.   There are two types of cookies classified by duration.

123.   "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie.  The user's web browser typically deletes session cookies when the user closes the browser.

124.    "Persistent cookies" are designed to survive beyond a single internet-browsing session.  The party creating the persistent cookie determines its lifespan.  As a result, a persistent cookie can acquire and record a user's internet communications for years and over dozens or even hundreds of websites.  Persistent cookies are also called "tracking cookies."

125.    Cookies are also classified by the party that uses the collected data.

126.    "First-party cookies" are set on a user's device by the website with which the user is exchanging communications.  First-party cookies can be helpful to the user, server, and/or website to assist with security, login, and functionality.

127.    "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications.  For example, the same patient who visits Santa Clara's website will also have cookies on their device from third parties, such as Facebook and Google.  Unlike first-party cookies, third-party cookies are not typically helpful to the user.  Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

128.    Data companies like Facebook have developed methods for monetizing and profiting from cookies.  These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell advertising that is customized to a user's communications and habits.  To build individual profiles of internet users, third party data companies assign each user a unique identifier or set of unique identifiers.

129.    Traditionally, first-party and third-party cookies were kept separate.  An internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server.  For example, although Santa Clara can deploy source code that uses Facebook third-party cookies to help Facebook acquire and record a patient's communications, Santa Clara is not permitted direct access to Facebook third-party cookie values.  The reverse *was* also true:  Facebook was not provided direct access to the values associated with first-party cookies set by companies like Santa Clara.  But Data companies have

designed a way to hack around the same-origin policy so that third-party data companies like Facebook can gain access to first-party cookies.

130.    JavaScript source code developed by third party data companies and placed on a webpage by a developer such as Santa Clara can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company.  This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user.  Once the cookie synching operation is completed, the two websites can exchange any information that they have collected and recorded about a user that is associated with a cookie identifier number.  The technique can also be used to track an individual who has chosen to deploy third-party cookie blockers.

131.    In effect, cookie synching is a method through which Facebook, Google, and other third-party marketing companies set and access third-party cookies that masquerade as first-party cookies.  By designing these special third-party cookies that are set for first-party websites, Facebook and Google hack their way around any cookie blockers that users set up to stop their tracking.

132.    The Facebook cookie used for cookie synching is named _fbp.

133.    On information and belief, the letters fbp are an acronym for Facebook Pixel.

134.    The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with the health care provider using the Meta Pixel.

135.    The _fbp cookie is also a third-party cookie in that it is also a cookie associated with Facebook that is used by Facebook to associate information about a person and their communications with non-Facebook entities while the person is on a non-Facebook website or app.

136.    Santa Clara requires patients using its patient portal to have enabled first-party cookies to gain access to its patient portal.

137.    The _fbp cookie is used as a unique identifier for patients by Facebook.

138.    If a patient takes an action to delete or clear third-party cookies from their device, the _fbp cookie is not impacted—even though it is a Facebook cookie—because Facebook has disguised it as a first-party cookie.  Facebook also uses IP addresses and user-agent information to match the health information it receives from Santa Clara with Facebook users.

139.    Santa Clara engages in cookie synching with Facebook, as well as with Google and other third parties.

140.    Santa Clara's cookie disclosures include the deployment of cookie synching techniques that cause the disclosure of the first-party cookie values that Santa Clara assigns to patients to also be made to third parties.

141.    Santa Clara uses and causes the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

142.    A third type of personally identifiable information is what data companies refer to as a "browser-fingerprint."  A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

143.    These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.  As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[7] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[8]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[9]

---

[7] https://www.blog.google/products/chrome/building-a-more-private-web/

[8] https://pixelprivacy.com/resources/browser-fingerprinting/

[9] https://www.blog.google/products/chrome/building-a-more-private-web/

144.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[10]

145.    Browser-fingerprints are personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

146.    Santa Clara uses and causes the disclosure of data sufficient for third parties to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

147.    A fourth kind of personally identifiable information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered.  A Facebook ID is an identifying number string that is connected to a user's Facebook profile.[11]  Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[12]

148.    Unique identifiers such as a person's Facebook ID are likewise capable of collection through pixel trackers.

149.    Each of the individual data elements described above is personally identifiable on their own.  However, Santa Clara's disclosures of such personally identifiable data elements do not occur in a vacuum.  The disclosures of the different data elements are tied together and, when taken together, these data elements are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals.

---

[10] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

[11] https://www.facebook.com/help/211813265517027

[12] https://smallseotools.com/find-facebook-id/

**D. Facebook's Business Model:  Exploiting Users' Personal Information for Profit**

150.     Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

151.     Facebook describes itself as a "real identity" platform.[13] This means that users are permitted only one account and must share "the name they go by in everyday life."[14] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[15]

152.     In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[16] Facebook has since evolved into one of the largest advertising companies in the world.[17] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[18] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[19]

153.     Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[20]

154.     Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal

---

[13] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.

[14] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/

[15] https://www.facebook.com/help/406644739431633

[16] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/

[17] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/

[18] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[19] https://www.facebook.com/business/ads/ad-targeting

[20] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code.

155.    Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

156.    Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[21] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

**E. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

157.    To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

158.    One of Facebook's most powerful tools is called the "Meta Pixel."

---

[21] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

159.    The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[22]  Once activated, the Meta Pixel "tracks the people and type of actions they take."[23]  Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[24] The Meta Pixel code works by sending Facebook a detailed log of a user's interaction with a website such as clicking on a product or running a search via a query box. The Meta Pixel also captures information such as what content a user views on a website or how far down a web page they scrolled.[25]

160.    When a patient uses their healthcare provider's website or application where the Meta Pixel is present, the Meta Pixel transmits the content of their communications to Facebook, including but not limited to (1) signing up for a patient portal, (2) signing-in and -out of a patient portal, (3) taking actions inside a patient portal, (4) making or scheduling appointments, (5) exchanging communications related to doctors, treatments, payment information, health insurance information, prescription drugs, prescriptions, side effects, conditions, diagnoses, prognoses, or symptoms of health conditions, (6) conduct a search on a Facebook partner website, and (7) other information that qualifies as Personal Health Information and/or Protected Health Information under state and federal laws.

161.    In many circumstances, Facebook also obtains information from health care providers that identify a Facebook user's status as a patient and other health information that is protected by state and federal law.  This occurs through tools that Facebook encourages health care providers to use to upload customer (i.e., patient) lists for use in its advertising systems.

162.    The information transmitted from a health care provider's website or application is sufficient to uniquely identify a patient under federal law (such as IP addresses and device

---

[22] https://developers.facebook.com/docs/meta-pixel/

[23] https://www.facebook.com/business/goals/retargeting

[24] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[25] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

identifiers that Facebook associates with a patient's Facebook account), and may also include a patient's demographic information, email address, phone number, computer IP address, contact information, appointment type and date, treating physicians, button and menu selections, the content of buttons clicked, information typed into text boxes, and information about the substance, purport, and meaning of patient requests for information from their health care providers.

163.   When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but simultaneous) channel in a manner that is undetectable by the user.[26]  This information is disclosed to Facebook regardless of whether a user is logged into their Facebook account at the time.

164.   The transmission is instantaneous—indeed Facebook often receives the information before the health care provider does.

165.   The transmission is invisible.

166.   The transmission is made without any affirmative action taken by the patient.

167.   The transmission occurs without any notice to the patient that it is occurring.

168.   Facebook collects the transmitted identifiable health information and uses "cookies" to match it to Facebook users, allowing Facebook to target ads to a person who, for example, has used a patient portal and has exchanged communications about a specific condition, such as cancer.

169.   The information Meta Pixel captures and discloses to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identifiable information of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it.[27]  When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request

---

[26] *See, e.g., In re Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).

[27] *In re Facebook*, 956 F.3d at 596.

and where to find them.  Thus, the URL provides significant information regarding a user's browsing history, including identifiable information for the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

170.    These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform.  In this manner, Facebook tracks users' browsing histories on third-party websites and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[28]

171.    For example, if the Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook also receives personally identifiable information like IP addresses, Facebook IDs, user agent information, device identifiers, and other data. All this personally identifiable data is available each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies who wish to display advertising for products similar to what the user looked at on the original shopping website.

172.    These communications with Facebook happen silently, without users' knowledge. By default, the transmission of information to Facebook's servers is invisible.  Facebook's Meta Pixel allows third-party websites to capture and send personal information a user provides to match them with Facebook or Instagram profiles, even if they are not logged into Facebook at the time.[29]

---

[28] *In re Facebook*, 956 F.3d at 596.

[29] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

173.    In exchange for installing its Meta Pixel, Facebook provides website owners like Santa Clara with analytics about the ads they have placed on Facebook and Instagram and tools to target people who have visited its websites.[30]

174.    The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.[31]

175.    Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

176.    Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[32]  According to Facebook, the Meta Pixel is an analytics tool that allows businesses to measure the effectiveness of their advertising by understanding the actions people take on its websites."[33]

177.    Facebook warns web developers that its Pixel enables Facebook "to match your website visitors to their respective Facebook User accounts."[34]

178.    Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chances of browsers or code blocking Pixel's execution and to ensure that visitors will be tracked.[35]

179.    Once the Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as

---

[30] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

[31] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

[32] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/

[33] https://www.oviond.com/understanding-the-facebook-pixel

[34] https://developers.facebook.com/docs/meta-pixel/get-started

[35] https://developers.facebook.com/docs/meta-pixel/get-started

1   "optional values" set by the business website.[36]   Facebook builds user profiles on users that

2   include the user's real name, address, location, email addresses, friends, likes, and

3   communications that Facebook associates with personal identifiers, such as IP addresses and the

4   Facebook ID.  Meta Pixel tracks this data regardless of whether a user is logged into Facebook.

5        180.   Facebook tracks non-Facebook users through its widespread internet marketing

6   products and source code, and Mark Zuckerberg has conceded that the company maintains

7   "shadow profiles" on nonusers of Facebook.[37]

8        181.   For Facebook, the Meta Pixel tool embedded on third-party websites acts as a

9   conduit for information, sending the information it collects to Facebook through scripts running

10  in a user's internet browser, similar to how a "bug" or wiretap can capture audio information.  The

11  information is sent in data packets, which include personally identifiable data.

12       182.   For example, the Meta Pixel is configured to automatically collect "HTTP

13  Headers" and "Pixel-specific data."[38]   HTTP headers collect data including "IP addresses,

14  information about the web browser, page location, document, referrer and person using the

15  website."[39]  Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[40]

16       183.   Meta Pixel takes the information it harvests and sends it to Facebook with

17  personally identifiable information, such as a user's IP address, name, email, phone number, and

18  specific Facebook ID.  Anyone who has access to this Facebook ID can use this identifier to

19  quickly and easily locate, access, and view a user's corresponding Facebook profile.  Facebook

20  stores this information on its servers, and, in some instances, maintains this information for

21  years.[41]

22

23  _____

    [36] https://developers.facebook.com/docs/meta-pixel/

24  [37] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/

25  [38] https://developers.facebook.com/docs/meta-pixel/

    [39] https://developers.facebook.com/docs/meta-pixel/

26  [40] https://developers.facebook.com/docs/meta-pixel/

27  [41] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

28

184.   Facebook has a number of ways to exploit the data that is being forwarded from third-party websites through the Meta Pixel.

185.   If a user has a Facebook account, the user data may be collected and linked to the individual user's Facebook account.  For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

186.   Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie."[42]   The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[43]

187.   Facebook can also link user data to Facebook accounts through identifying information collected through Meta Pixel through what Facebook calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching.[44]  Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data.  Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

188.   While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data.[45]  In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[46]

---

[42] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/

[43] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/

[44] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

[45] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

[46]https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

189.     Facebook also receives personally identifiable information in the form of user's unique IP addresses, which remain the same as users visit multiple websites.  When browsing a third-party website that has embedded Facebook code, a user's IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets.  The IP address enables Facebook to keep track of the website page visits associated with that address.

190.     Facebook also places cookies on visitors' computers.  It then uses these cookies to store information about each user.  For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID.  The c_user cookie value is a means of identification  that is the Facebook equivalent of a user identification number.  Each Facebook user has one—and only one—unique c_user cookie.  Facebook uses the c_user cookie to record user activities and communications.

191.     An unskilled computer user can obtain the c_user value for any Facebook user by (1) going to the user's Facebook page, (2) right-clicking with their mouse anywhere on the background of the page, (3) selecting 'View page source,' (4) executing a control-F function for "user=" and (5) copying the number value that immediately follows "user=" in the page source code of the target Facebook user's page.

192.     It is even easier to find the Facebook account associated with a c_user cookie: one simply needs to log-in to Facebook, and then type www.facebook.com/#, with # representing the c_user cookie identifier. For example, the c_user cookie value for Mark Zuckerberg is 4. Logging in to Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

193.     The datr cookie identifies the patient's specific web browser from which the patient is sending the communication. It is an identifier that is unique to the patient's specific web browser and is therefore a means of identification for Facebook users. Facebook keeps a record of every datr cookie identifier associated with each of its users, and a Facebook user can obtain a redacted list of all datr cookies associated with his or her Facebook account from Facebook.

194.    The fr cookie is a Facebook identifier that is an encrypted combination of the c_user and datr cookies.

195.    The fbp cookie is a Facebook identifier that is set by Facebook source code and associated with Santa Clara's use of the Facebook Tracking Pixel program.

196.    The fbp cookie emanates from Santa Clara's Web Properties as a putative first-party cookie, but is transmitted to Facebook through cookie synching technology that hacks around the same-origin policy.

197.    Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser.  Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers.  Facebook employs similar cookies such as the "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[47] These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[48]

198.    Facebook also uses browser fingerprinting to uniquely identify individuals.  Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more.  Together, these attributes create a fingerprint that is highly distinctive.  The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like Santa Clara's website, and target users with advertising based on their web activity.

---

[47] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.

[48] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

199.    Facebook then sells advertising space by highlighting its ability to target users. Facebook can target users so effectively because it surveils user activity both on and off its official website.  This allows Facebook to make inferences about users far beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[49]    Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to create highly specific targeted advertising.  Indeed, Facebook uses precisely the type of Personal Health Information that Santa Clara bartered to Facebook so that Facebook can identify, target, and market products and services to individuals.

**F.  Santa Clara has embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' and users' protected health information to Facebook.**

200.    A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

201.    Facebook's intrusion into the personal data of visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[50] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

202.    Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through

---

[49] https://www.facebook.com/business/ads/ad-targeting

[50] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

future Facebook ads.[51] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[52] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

203.   Businesses install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites.[53] Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for advertising purposes.[54]

204.   Recently, investigative journalists have determined that Meta Pixel is embedded on the websites of many of the top hospitals in the United States.[55] This results in sensitive medical information being collected and then sent to Facebook when a user interacts with these hospital websites.

205.   For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

206.   Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or logout of a patient portal or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

---

[51] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[52] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/

[53] https://instapage.com/blog/meta-pixel

[54] https://instapage.com/blog/meta-pixel

[55] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

FOURTH AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

207.    Santa Clara is among the hospital systems who have embedded Meta Pixel on their websites.  Via its use of the Meta Pixel, Santa Clara intercepted and disclosed the contents of Plaintiff and Class Members' communications with Santa Clara, including the precise text of patient search queries and communications about specific doctors, communications about medical conditions and treatments, buttons clicked to Search, Find a Doctor, connect, Login, or Enroll in Santa Clara's patient portal, summaries of Santa Clara's responsive communications, the parties to the communications, appointment information, and the existence of communications at Santa Clara's websites.

208.    For example, when a patient visits the homepage of Santa Clara's website, the source code employed by Santa Clara causes personally identifiable information to be transmitted to Facebook and Google.

209.    Many of the tabs provided by Santa Clara on its website are specific to patients— i.e., "Find a Provider," "Patients and Visitors," "Health Care Services," "Education & Training," and "MyHealth Online," among others (collectively, "Patient Tabs").  Clicking on any of the Patient Tabs identifies the person using the website as a patient.

210.    For example, when a patient enters their personal information through Santa Clara's websites that incorporate Meta Pixel, such as to locate a doctor, this information, including what the patient is being treated for, is immediately and instantaneously routed to Facebook via the Meta Pixel.  The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

211.    This data, which can include health conditions (e.g., addiction, HIV, heart disease), diagnoses, procedures, test results, the treating physician, medications, as well as personally identifiable information (collectively, "Personal Health Information"), is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

212.    In addition, through the source code deployed by Santa Clara, Santa Clara provides third parties (including Facebook and Google) with other data, such as cookies that Santa Clara

uses to help Facebook identify patients.  Those cookies include (but are not necessarily limited to) cookies named: c_user, datr, fr, and fbp.

213.    For example, the fbp cookie is a Facebook identifier that is set by Facebook source code and associated with Santa Clara's use of the Facebook Tracking Pixel program. The fbp cookie emanates from Santa Clara's Web Properties as a putative first-party cookie, but is transmitted to Facebook through cookie synching technology that hacks around the same-origin policy. This data was disclosed to Facebook simultaneously in real time as visitors transmitted their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Santa Clara also disclosed other personally identifiable information to Facebook, such as patient and user IP addresses, cookie identifiers, browser-fingerprints, and device identifiers. Santa Clara also discloses the same kind of information to Google Analytics and Google Double Click every time a patient fills out the above form.

214.    Santa Clara causes similar data transmissions to be sent to Facebook and Google with every communication that a patient sends using the Patient Tabs.

215.    Santa Clara discloses such personally identifiable information and sensitive medical information even when patients or users are searching for doctors to assist them with treatments such as HIV:



216.    Likewise, if a patient wants to access their medical records, schedule appointments, email their doctor, view lab results, or refill medications, they are required to do so by navigating to Santa Clara's website patient portal—all while Santa Clara's website tracks their activity:



217.    Each time a patient, including Plaintiff and Class Members, visited Santa Clara's patient portal, tracking pixels installed on the navigation button from the home page to the portal login page caused the patient's personal identifiers, including the patient's IP address, to be

transmitted to Google and other third parties attached to the fact that the patient has exchanged a communication with Santa Clara regarding the patient portal.

218. On information and belief, the Santa Clara patient portal is designed to permit the deployment of custom analytics scripts within the patient portal, including Google Analytics, which allows for the transmission of patients' Personal Health Information, including medical and health-related information, and communications to third parties.

219. On information and belief, Santa Clara took advantage of the patient portal's analytics compatibility by knowingly and secretly deploying Google source code inside its patient portal that caused the contemporaneous unauthorized transmission of Personal Health Information and the precise content of patient communications with Santa Clara to be sent to Google whenever a patient used the patient portal, including when Plaintiff used Santa Clara's patient portal in June 2023 to communicate with her doctor and view test results.

220. All this information is acquired by Santa Clara and forwarded to third parties, including Google, via tracking devices that Santa Clara has installed on its Web Properties.

221. When a patient sends a communication searching for more information about their condition, Santa Clara causes data transmissions to be made to third parties, including Facebook and Google, which include Personal Health Information, including personally identifiable information and the content of the patient's communications.

222. In other words, Facebook learns not just that patients are seeking treatment, but where and typically when they are seeking treatment, along with other information that patients would reasonably assume that Santa Clara is not sharing with third party marketing companies.

223. Santa Clara also discloses patient information from across its website at https://scvmc.scvh.org including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for services offered by Santa Clara, communications made by patients making appointments, communications

1  made when patients access Santa Clara's patient portal, and communications made when patients

2  are researching specific medical conditions such as COVID-19.

3          224.    Despite its own legal obligations and internal policies, Santa Clara's source code

4  causes the interception and transmission of the following personally identifiable information

5  ("PII") to third parties whenever a patient uses Santa Clara's Web Properties, including on its

6  website and patient portal:

7          a.      Patient IP addresses;

8          b.      Unique, persistent patient cookie identifiers;

9          c.      Device identifiers;

10         d.      Account numbers;

11         e.      URLs;

12         f.      Other unique identifying numbers, characteristics, or codes, including patients'

13                 Facebook IDs; and

14         g.      Browser-fingerprints.

15         225.    To make the transmissions of patient information and communications to

16  Facebook and Google, Santa Clara deployed Facebook and Google source code on its Web

17  Properties.

18         226.    The Santa Clara-deployed source code did the following things:

19              a.  Without any action or authorization, Santa Clara deposited cookies such as

20                  the _fbp, _ga, and _gid cookies onto Plaintiff's and Class Members'

21                  computing devices. These are cookies associated with the third-parties

22                  Facebook and Google but which Santa Clara deposits on Plaintiff's and

23                  Class Members' computing devices by disguising them as first-party

24                  cookies.

25              b.  Without any action or authorization, Santa Clara's source code

26                  commanded Plaintiff's and Class Members' computing devices to

27

28

contemporaneously re-direct the Plaintiff's and Class Members' identifiers and the content of their communications to Facebook, Google, and others.

c. These cookies occupied storage space on Plaintiff's and Class Members' devices and used the resources of those devices without authorization, causing them to have less available storage space and work more slowly than they otherwise would have.

227. Whenever a patient uses Santa Clara's Web Properties, Santa Clara intercepts, causes transmission of, and uses personally identifiable patient data without patient knowledge, consent, authorization, or any further action by the patient.

228. Santa Clara disclosed Plaintiff's and Class Members' personally identifiable patient data, including their status as patients and the contents of their communications with Santa Clara, to third parties including Facebook and Google.

229. Santa Clara's unauthorized disclosures to third parties include information that identifies Plaintiff and Class Members as patients of Santa Clara and aids the third parties in receiving and recording patient communications pertaining to or about specific doctors, conditions, treatments, payments, and connections to Santa Clara's patient portal.

230. Facebook's Meta Pixel collects and forwards this data to Facebook, including the full referral URL (including the exact subpage of the precise terms being reviewed), and Facebook then correlates the URL with the patient's Facebook user ID, time stamp, browser settings, and even the type of browser used. In short, the URLs, by virtue of including the particular document within a website that a patient views, reveal a significant amount of personal data about a patient. The captured search terms and the resulting URLs divulge a patient's medical issues, personal interests, queries, and interests on third-party websites operating outside of Facebook's platform.

231. The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Santa Clara's websites. The path identifies where a file can be found

on a website.  For example, a patient reviewing information about the "Services" that Santa Clara offers patients such as information about Covid-19 will generate a URL with the path https://scvmc.scvh.org/patients-visitors/services/covid-19-oral-antiviral.

232.    Likewise, a query string provides a list of parameters.  An example of a URL that provides a query string is https://scvmc.scvh.org/search?q=HIV.  The query string parameters in this search indicate that a search was done at Defendant's website for information about chemotherapy.  In other words, the Meta Pixel captures information that connects a particular user to a particular healthcare provider.

233.    Santa Clara also provides Facebook and Google with details about online forms that patients fill out in the form of POST requests.  All the information that patients provide when filling out these forms is also disclosed to Facebook and Google.

234.    As the above demonstrates, knowing what information a patient is reviewing on Santa Clara's website can reveal deeply personal and private information.  For example, a simple search for "pregnancy" on Santa Clara's website tells Facebook that the patient is likely pregnant. Indeed, Facebook might know that the patient is pregnant before the patient's close family and friends.  But there is nothing visible on Santa Clara's website that would indicate to patients that, when they use Santa Clara's search function, their personally identifiable information and the precise content of their communications with Santa Clara are being automatically captured and made available to Facebook, who can then use that information for advertising purposes even when patients search for treatment options for sensitive medical conditions such as cancer or substance abuse.

235.    The amount of data collected is significant.  Via the Meta Pixel, when patients interact with its website, Santa Clara discloses a full-string, detailed URL to Facebook, which contains the name of the website, folder and sub-folders on the webserver, and the name of the precise file requested.  For example, when a patient types a search term into the search bar on Santa Clara's website, the website returns links to information relevant to the search term.  When

patients then click these links, a communication is created that contains a GET request and a full-string detailed URL.

236.   The contents of patients' search terms shared with Facebook plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with Santa Clara's website.  Worse, no matter how sensitive the area of the Santa Clara's website that a patient reviews, the referral URL is acquired by Facebook along with other personally identifiable information.

237.   The nature of the collected data is also important.  Santa Clara's unauthorized disclosures result in Facebook obtaining a comprehensive browsing history of an individual patient, no matter how sensitive the patient's medical condition.  Facebook is then able to correlate that history with the time of day and other user actions on Santa Clara's website.  This process results in Facebook acquiring a vast repository of personal data about patients—all without their knowledge or consent.

238.   Santa Clara also discloses the same kind of patient data described above to other third parties involved in internet marketing, including Google, YouTube, and New Relic, via tracking software that Santa Clara has installed on its website.  As with the Facebook Meta Pixel, Santa Clara provides patients and prospective patients with no notice that Santa Clara is disclosing the contents of their communications to these third parties.  Likewise, Santa Clara does not obtain consent from patients and prospective patients before forwarding their communications to these companies.

239.   These disclosures to third parties other than Facebook are equally disturbing. Google Analytics, for example, has been described by the Wall Street Journal as "far and away the web's most dominant analytics platform," which "tracks you whether or not you are logged in."[56]  Like Facebook, Google tracks internet users with IP addresses, cookies, geolocation, and other unique device identifiers.   Santa Clara routinely discloses patients' Personal Health

---

[56] https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401

Information to such Google services as Google Analytics, Google DoubleClick, and Google AdWords.

240.   Google cookies are personally identifiable. For example, Google cookies called 'SID' and 'HSID' contain digitally signed and encrypted records of a user's Google account ID and most recent sign-in time.

241.   Most people who use Google services have a preferences cookie called 'NID' in their browsers. When you visit a Google service, the browser sends this cookie with your request for a page. The NID cookie contains a unique ID Google uses to remember your preferences and other information.

242.   Google uses cookies like NID and SID to help customize ads on Google properties, like Google Search. For example, Google uses such cookies to remember users' most recent searches, previous interactions with an advertiser's ads or search results, and visits to an advertiser's website. This helps Google show customized ads to users on Google.

243.   Google also uses one or more cookies for advertising it serves across the web. One of the main advertising cookies on non-Google sites is named 'IDE' and is stored in browsers under the domain doubleclick.net. Another is stored in google.com and is called ANID. Google also uses other cookies with names such as DSID, FLC, AID, TAID, and exchange_uid. Other Google properties, like YouTube, may also use these cookies to show users ads.

244.   Google cookies provide personally identifiable data about patients who visit Santa Clara's website to Google.  Santa Clara transmits personally identifiable Google cookie data to Google.

245.   Google warns web-developers that Google marketing tools are not appropriate for health-related webpages and websites.  Indeed, Google warns web developers that "Health" is a prohibited category that should not be used by advertisers to target ads to users or promote advertisers' products or services.

246.    Santa Clara deploys Google tracking tools on essentially every page of its websites, resulting in the disclosure of communications exchanged with patients to be transmitted to Google.  These transmissions occur simultaneously with patients' communications with Santa Clara and include communications that Plaintiff and Class Members made about specific medical providers, treatments, conditions, appointments, payments, and registrations and logins to Santa Clara's patient portal.

247.    By compelling visitors to its websites to disclose personally identifiable data and sensitive medical information to Facebook, Santa Clara knowingly discloses information that allows Facebook and other advertisers to link patients' and visitors' Personal Health Information to their private identities and target them with advertising (or do whatever else Facebook may choose to do with this data, including running "experiments" on its customers by manipulating the information they are shown on their Facebook pages).[57]  Santa Clara intentionally shared the Personal Health Information of its patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

248.    Santa Clara facilitated the disclosure of Plaintiff's Personal Health Information, including sensitive medical information, to Facebook without her consent or authorization when he entered information on the website that Santa Clara maintains at https://scvmc.scvh.org/home.

249.    For example, Plaintiff Jane Doe is an individual with a Facebook account who is also a patient of Santa Clara and who has received treatment by Santa Clara's doctors at Santa Clara's medical facilities.  Plaintiff has been a Santa Clara Valley Medical Center patient since 2017.  Plaintiff has visited Santa Clara's website since 2018, including in June 2023, and entered data, including sensitive medical information, such as details about her medical condition. Plaintiff has regularly used Santa Clara's patient portal since 2017.  The information that Plaintiff transmitted included queries about treatment for cirrhosis of liver and ascites, generalized anxiety

---

[57]        https://www.theatlantic.com/technology/archive/2014/06/everything-we-know-about-facebooks-secret-mood-manipulation-experiment/373648/

disorder, migraines, and carpal tunnel syndrome. The treatments that Plaintiff explored on Santa Clara's website included psychiatric treatment, physical therapy, and pain management. She also used Santa Clara's website to search for a neurologist.

250.    Throughout, Plaintiff has also used Santa Clara's patient portal to schedule appointments, order medications, view test results, and message her doctor.

251.    In addition to using Santa Clara's patient portal (for which the navigation button to the login page was embedded with a tracking pixel), when interacting with the Santa Clara's website and patient portal, Plaintiff also communicated such specific details as her name, her patient status, the name of her specific treating physician, her browsing history, and the name of the specific medical conditions that she was seeking treatment for.

252.    This information could then be combined with other information in Facebook's possession, like her name, date of birth, and phone number, to more effectively target Plaintiff with advertisements or sell Plaintiff's data to third parties.

253.    Because Santa Clara embedded the Meta Pixel on its website, Santa Clara disclosed intimate details about Plaintiff's interactions with its website, including Plaintiff's scrolling, typing, and selecting options from drop down menus.  Each time the Meta Pixel was triggered, it caused Plaintiff's information to be secretly transmitted to Facebook's servers, as well as additional information that captures and discloses the communications' content and Plaintiff's identity.  For example, when Plaintiff and Class Members visited Santa Clara's website, their Personal Health Information was transmitted to Facebook, including such engagement as using the website's search bar, using the website's Find a Doctor function, and typing content into online forms.  During these same transmissions, Santa Clara's website would also provide Facebook with Plaintiff's and Class Members' Facebook ID, IP addresses, device IDs, and other information that Plaintiff and Class Members provided.  This is precisely the type of information that state and federal law require healthcare providers to de-identify to protect the privacy of patients.

254.    Facebook and Google used the data provided by Santa Clara to send Plaintiff targeted advertising related to her medical conditions.  Indeed, after visiting Santa Clara's website, Plaintiff began receiving targeted advertising on her Facebook page related to her medical conditions, including advertisements for pain management, other advertisements for medications for her various conditions, and solicitations to participate in research questionnaires, research studies, and clinical trials.

255.    Because Santa Clara embedded the Meta Pixel on its websites, Santa Clara disclosed intimate details about Plaintiff's and the Class Members' interactions with its websites, including when Plaintiff and Class Members selected options from drop down menus.

256.    One or more persons at Facebook and Google viewed Plaintiff's and Class Members' Personal Health Information as a consequence of Santa Clara's installation of the Meta Pixel on its Web Properties. After Plaintiff's and Class Members' Personal Health Information had been intercepted and collected, individuals at Facebook processed, analyzed, and assimilated Plaintiff's and Class Members' Personal Health Information into data sets like "Core Audiences" and "Custom Audiences" for the purpose of targeting Plaintiff and Class Members with advertising.

257.    Santa Clara knew that by embedding Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiff's and the Class Members' Personal Health Information, including sensitive medical information and personally identifying data. Santa Clara was also aware that such information would be shared with Facebook simultaneously with patients' interactions with its websites. Santa Clara was also aware that installing the Meta Pixel tool would result in one or more unauthorized persons at Facebook and Google viewing the Personal Health Information of Santa Clara's patients, including the Personal Health Information of Plaintiff and Class Members. Santa Clara's decision to affirmatively communicate and share its patients' Personal Health Information with Facebook, Google, and those companies' employees violates the numerous protections afforded by California law.

258.     Santa Clara also knew that installing the Meta Pixel on its website would result in its patients' Personal Health Information being improperly accessed by Facebook and its employees so that Facebook could sell advertising.  Santa Clara made the decision to barter its patients' Personal Health Information to Facebook because it wanted access to the Meta Pixel tool.  While that bargain may have benefited Santa Clara and Facebook, it also violated the privacy rights of Plaintiff and Class Members.

**G. Santa Clara's interception and disclosure of patient communications permits Facebook, Google, and other third-party advertising companies to engage in cross-device targeting across multiple devices.**

259.     In addition to enabling Santa Clara to advertise to patients and potential patients on other websites, Santa Clara's misuse and exploitation of patient data and communications also facilitates third parties' ability to target advertisements on other computing devices that a patient uses.  This is called cross-device targeting.

260.     Third parties including Facebook and Google have established a unique ID for individuals that tie together their desktop, laptop, and smartphone computing devices.  For example, even if a patient has never visited Santa Clara's website on their smartphone, cross-device tracking and marketing allows Santa Clara and other third parties to target patients on that device.  In other words, a patient or potential patient who visited Santa Clara's website on his desktop, but never on his smartphone, can nevertheless be targeted with advertisements by both Santa Clara and other third parties on his smartphone.

261.     Santa Clara's and other third parties' use of cross-device targeting demonstrates that the data Santa Clara discloses to third parties is personally identifiable because it enables patients to be tracked across multiple devices that patients own—even if a patient has never communicated with Santa Clara on one or more of their devices.

262.     Santa Clara has made the decision that access to the targeted advertising (including retargeting and cross-device tracking) that is enabled by its disclosure of patient data and communications is of commercial benefit to Santa Clara.

263.     Santa Clara obtains additional revenue from its deployment of third-party tracking tools through which it discloses personally identifying patient data and communications to third parties, including Google and Facebook.

264.     Any additional revenue that that Santa Clara obtained from its unauthorized misuse of its own patients' Personal Health Information is unearned and is the rightful property of the patients (including Plaintiff and Class Members) from whom it was obtained.

265.     Santa Clara's unauthorized disclosure and misuse of Plaintiff's and Class Members' Personal Health Information is a form of theft, for which the victims are entitled to recover anything acquired with the stolen assets, even if the items acquired have a value that exceeds the value of that which was stolen.

**H. Plaintiff and the Class Members did not consent to the interception and disclosure of their Protected Health Information.**

266.     Plaintiff and Class Members had no idea when they interacted with Santa Clara's websites that their personal data, including sensitive medical data, was being collected and simultaneously transmitted to Facebook. That is because, among other things, the Meta Pixel tool is seamlessly and secretly integrated into Santa Clara' websites and is invisible to patients visiting those websites.

267.     For example, when Plaintiff visited Santa Clara's website in 2023, there was no indication her Personal Health Information was being collected, transmitted, and monitored by Facebook for advertising purposes.

268.     Plaintiff and her fellow Class Members could not consent to Santa Clara's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook, Google, and other third parties for the purpose of targeting them with advertising.

269.     Moreover, it is against the law for Santa Clara to disclose individually identifying health information without giving appropriate notice to the patient and obtaining written consent.

270.    Santa Clara does not have a legal right to share Plaintiff's and Class Members' Protected Health Information ("PHI") with Facebook, because this information is protected from such disclosure by law. *See, e.g.*, CAL. CIV. CODE §§ 56 *et seq.*; 45 C.F.R. § 164.508. Nor is Santa Clara permitted to disclose patients' Protected Health Information to an advertising and marketing company like Facebook without express written authorization from patients.

271.    Indeed, the United States Department of Health and Human Services ("HHS") recently confirmed that hospitals are prohibited from transmitting individually identifiable health information via tracking technology like the Meta Pixel without a patient's authorization and other protections like a business associate agreement with the recipient of the patient data:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[58]

272.    The disclosure of Plaintiff's and class members' Personal Health Information via the tracking pixels contravenes both the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Personal Health Information.

273.    The bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, **discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.** Such disclosures can reveal incredibly sensitive information about an individual, **including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.** While

---

[58]    *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html, HHS.GOV (emphasis added) (last visited June 12, 2023).

it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[59]

274.    Plaintiff and Class Members face the same risks the government is warning about. Santa Clara has shared Plaintiff's and Class Members' search terms about health conditions for which they seek doctors; their contacts with doctors to make appointments; the names of their doctors; the frequency with which they take steps to obtain healthcare for certain conditions; and where they seek medical treatment. This information is, as described by the OCR bulletin, "highly sensitive." The Bulletin goes on to make clear how broad the government's view of protected information is.

275.    This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, *or any unique identifying code.*[60]

276.    Crucially, that paragraph in the government's Bulletin continues:

> All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[61]

---

[59]    *Id.* (emphasis added).

[60]    *Id.* (emphasis added).

[61]    *Id.*

FOURTH AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

277.    Likewise, after it became public knowledge that healthcare companies had been sharing their customers' medical information with Facebook and Google via tracking technologies embedded in their websites and apps, the FTC instituted a series of enforcement actions, including lawsuits against BetterHelp, GoodRx, Premom, and Vitagene.  These lawsuits, which resulted in healthcare companies paying millions of dollars in fines, underscore that healthcare companies violate both their privacy promises and federal law by failing to get consumers' affirmative express consent for the disclosure of sensitive health information.

278.    On July 20, 2023, the Federal Trade Commission, acting in concert with the United States Department of Health and Human Services' Office for Civil Rights, sent letters to approximately 130 hospital systems and telehealth providers to alert them "to the serious privacy and security risks related to the use of online tracking technologies" on hospital websites which have been "impermissibly disclosing consumers' sensitive health information to third parties."[62]

279.    The FTC's letter specifically warned hospitals that "use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities" can result in "a wide range of harms to an individual or others", including the disclosure of "health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[63]  The FTC's letter further warned hospitals that "HIPAA rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (*e.g.* tracking technology vendors) includes PHI.  HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA rules."[64]

280.    That same day the FTC issued a bulletin warning that even companies not covered by HIPAA have a responsibility to protect against the unauthorized disclosure of Personal Health Information and cautioning that the "unauthorized disclosure of such information may violate the

---

[62] https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

[63] https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

[64] https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

FTC Act and could constitute a breach of security under the FTC's Health Breach Notification Rule."[65]

281.    Santa Clara failed to obtain a valid written authorization from Plaintiff or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications by third parties for their own direct marketing uses. Moreover, no *additional* privacy breach by Facebook is necessary for harm to have accrued to Plaintiff and Class Members; the secret disclosure by Santa Clara of its patients' Personal Health Information to Facebook means that a significant privacy injury has *already occurred.*

282.    Likewise, a prospective or current patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Such "Browser-Wrap" statements do not create an enforceable contract against consumers.

283.    Neither Plaintiff nor Class Members knowingly consented to Santa Clara's disclosure of their Personal Health Information to Facebook. Nowhere in Santa Clara's privacy policy is it disclosed that Santa Clara routinely transmits patients' Personal Health Information to third party advertising companies like Facebook so that those companies can monetize and exploit patients' health data for advertising purposes. Without disclosing such practices, Santa Clara cannot have secured consent from Plaintiff and Class Members for the disclosure of their Personal Health Information to Facebook and other third-party advertising companies.

284.    Accordingly, Santa Clara lacked authorization to intercept, collect, and disclose Plaintiff's and Class Members' Personal Health Information to Facebook or aid in the same.

**I.  The disclosure of personal patient data to Facebook is unnecessary.**

285.    There is no information anywhere on the websites operated by Santa Clara that would alert patients that their most private information (such as their identifiers, their medical

---

[65] https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking

conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are the disclosures of patient Personal Health Information to Facebook necessary for Santa Clara to maintain their healthcare website or provide medical services to patients.

286.    For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Health Information to companies like Facebook. Likewise, it is possible for Santa Clara to provide medical services to patients without sharing their Personal Health Information with Facebook so that this information can be exploited for advertising purposes.

287.    Despite these possibilities, Santa Clara willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Santa Clara, to third parties, including Facebook and Google.

**J.  Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

288.    Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifiable data and sensitive medical information. Santa Clara's surreptitious interception, collection, and disclosure of Personal Health Information to Facebook violated Plaintiff and Class Members' privacy interests.

289.    As a patient, Plaintiff and Class Members had a reasonable expectation of privacy that her health care provider and its associates would not disclose their Personal Health Information to third parties without their express authorization. Those expectations are derived from multiple sources, including (a) Santa Clara's status as Plaintiff's and Class Members' health care provider, (b) Santa Clara's common-law obligations to maintain the confidentiality of patient data and communications, (c) state and federal laws and regulations protecting the confidentiality of medical information, (d) state and federal laws protecting the confidentiality of electronic

communications and computer data, and (e) state laws protecting unauthorized use of personal means of identification.

290.    The original Hippocratic Oath, circa 400 B.C., provided that physicians must pledge, "What I may see or hear in the course of treatment or even outside of the treatment in regard to the life of man, which on no account must be spread abroad, I will keep to myself holding such things shameful to be spoken about."[66]

291.    The modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."[67]  Likewise, the American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.  For example, the AMA has issued medical ethics opinions providing that

> Protecting information gathered in association with the care of a patient is a core value in health care.  However, respecting patient privacy in other forms is also fundamental, as an expression of respect for patient autonomy and a prerequisite for trust….Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should … [m]inimize intrusion on privacy when the patient's privacy must be balanced against other factors [and inform] the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware."[68]

292.    The AMA's ethics opinions have further cautioned physicians and hospitals that "[d]isclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship." [69]

---

[66] *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 671 n.1 (Mo. 1993).

[67] https://www.pbs.org/wgbh/nova/doctors/oath_modern.html

[68] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.1.1).

[69] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.2.4).

293.   Patient health information is specifically protected by law. The prohibitions against disclosing patient Personal Health Information include prohibitions against disclosing personally identifiable data such as patient names, IP addresses, and other unique characteristics or codes. *See, e.g.*, CAL. CIV. CODE § 56.05 ("medical information"); 45 C.F.R. § 164.514.

294.   Plaintiff and Class Members' reasonable expectations of privacy in their Personal Health Information are grounded in, among other things, Defendant's status as a health care provider, Defendant's common-law obligation to maintain the confidentiality of patients' Personal Health Information, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, and state laws prohibiting the unauthorized use and disclosure of personal means of identification.

295.   Given the application of these laws to Santa Clara, Plaintiff and the Members of the Class had a reasonable expectation of privacy in their Protected Health Information.

296.   Indeed, several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

297.   Polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

298.   For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[70]

---

[70] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/

299.     Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[71]

300.     "Patients are highly sensitive to disclosure of their health information," particularly because it "often involves intimate and personal facts, with a heavy emotional overlay."[72] Unsurprisingly, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of Americans express concern about the privacy of their medical records."[73]

301.     The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[74]

302.     Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's Personal Health Information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

---

[71] https://www.wired.co.uk/article/apple-ios14-facebook

[72] Peter A. Winn, *Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common Law*, 33 RUTGERS L.J. 617, 621 (2002).

[73] Sharona Hoffman & Andy Podgurski, *E-Health Hazards: Provider Liability and Electronic Health Record Systems*, 24 BERKLEY TECH L.J. 1523, 1557 (2009).

[74] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

**K. Plaintiff's and Class Members' Personal Health Information that Santa Clara collected, disclosed, and used has economic value, and its disclosure has caused Plaintiff and Class Members harm.**

303.     Property is the right of any person to possess, use, enjoy, or dispose of a thing, including intangible things like data and communications. Plaintiff and Class Members have a vested property right in their Personal Health Information.

304.     The United States Supreme Court has explained that, "Confidential business information has long been recognized as property." *Carpenter v. United States*, 484 U.S. 19, 26 (1987). "Depriv[ation] of [the] right to exclusive use of … information" causes a loss of property "for exclusivity is an important aspect of confidential business information and most private property for that matter." *Id*. at 27.  There is no doubt that Santa Clara has a "property right" in patient data such that, if Facebook or Google took such information from Santa Clara without authorization, Santa Clara would have a claim for Facebook and Google's taking of their property. Patients also have a property right in their own health information that may not be taken or used by Santa Clara without their authorization for non-health care related reasons.

305.     Federal and state law grant patients the right to protect the confidentiality of data that identifies them as patients of a particular health care provider and restrict the use of their health data, including their status as a patient, to only uses related to their care or otherwise authorized by federal or state law in the absence of patient authorization.

306.     A patient's right to protect the confidentiality of their health data and restrict access to it is a valuable right.

307.     In addition to property rights in their health data, patients enjoy property rights in the privacy of their health communications.

308.     Patient property rights in their health data and communications are established by HIPAA and state health privacy laws that are equally or more stringent than HIPAA, including CIMA.

309.     Santa Clara's unauthorized acquisition, use, and disclosure of Plaintiff's and Class Members' individual Personal Health Information for marketing purposes violated their property rights to control how their health data and communications are used and who may be the beneficiaries of their data and communications.

310.     It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Santa Clara has collected and disclosed from Plaintiff and Class Members.  Indeed, the value of data that companies like Facebook and Google extract from people who use the Internet is well understood and generally accepted in the e-commerce industry.

311.     Personal information is now viewed as a form of currency. Professor Paul M. Schwartz noted in the Harvard Law Review:

Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.  Paul M. Schwartz, Property, Privacy and Personal Data, 117 HARV. L. REV. 2055, 2056-57 (2004).

312.     For example, in 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."

313.     In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."  This price is only increasing.  According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.

314.     Medical information derived from medical providers garners even more value from the fact that it is not available to third party data marketing companies because of strict

restrictions on provider disclosures under HIPAA, state laws, and provider standards, including the Hippocratic oath.

315.    The cash value of Internet users' Personal Health Information can be quantified. In a 2015 study by the Ponemon Institute, researchers determined the value that American Internet users place on their "health condition" as more valuable than any other piece of data about them, with a minimum value of $82.90.[75]

316.    In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.  That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.

317.    Despite the protections afforded by law, there is an active market for health information.  Medical information obtained from health care providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.

318.    Further, individuals can sell or monetize their own data if they so choose.  For example, Facebook has offered to pay individuals for their voice recordings and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.

319.    A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.

---

[75] Ponemon Institute, Privacy and Security in a Connected Life: A Study of US Consumers, March 2015, available at https://vdocuments.site/privacy-and-security-in-a-connected-life-protect-personal-information-from-being.html?page=1.

320.     Santa Clara was compensated for its disclosures of Plaintiff's and Class Members' personally identifiable patient data and communications by the third-party recipients in the form of enhanced marketing services or other compensation.

321.     Santa Clara did not pay or offer to pay Plaintiff or Class Members for their communications or personally identifiable patient data associated with these disclosures before or after the disclosures were made.

322.     Santa Clara profited from Plaintiff's and Class Members' information without ever intending to compensate Plaintiff and Class Members or inform them that the disclosures had been made.

323.     Santa Clara was unjustly enriched by its conduct.

324.     Given the monetary value that data companies like Facebook have already paid for personal information in the past, Santa Clara has deprived Plaintiff and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiff's and the Class Members' property.

**L. Santa Clara's failure to inform its patients and prospective patients that their Personal Health Information has been disclosed to Facebook or to take any steps to halt the continued disclosure of patients' Personal Health Information is malicious, oppressive, and in reckless disregard of Plaintiff and Class Members' rights.**

325.     Hospital systems, like other businesses, have a legal obligation to disclose data breaches to their customers.  *E.g.* CAL. CIV. CODE § 1798.82.

326.     Santa Clara's decision to hide its use of the Meta Pixel tool from its own patients and its refusal to remove all such technologies from its websites even after learning that its patients' Personal Health Information was being routinely collected, transmitted, and exploited by Facebook, Google, and other third parties is malicious, oppressive, and in reckless disregard of Plaintiff's and Class Members' rights.

**M.  Tolling, Concealment, and Estoppel**

327.     The applicable statutes of limitation have been tolled as a result of Defendant's

knowing and active concealment and denial of the facts alleged herein.

328.    Santa Clara seamlessly and secretively incorporated Meta Pixel and other trackers into its websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Santa Clara had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that Plaintiff and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

329.    Plaintiff and Class Members could not with due diligence have discovered the full scope of Defendant's conduct, because there were no disclosures or other indication that Santa Clara was sharing their Personal Health Information with companies like Facebook, so that Facebook could exploit their Personal Health Information via targeted advertising campaigns.

330.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' and users' Personal Health Information has continued unabated through the date of the filing of this complaint. What's more, Santa Clara was under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## VII. CLASS DEFINIITION

331.    Defendant's conduct violates the law.

332.    Defendant's unlawful conduct has injured Plaintiff and Class Members.

333.    Defendant's conduct is ongoing.

334.    Plaintiff brings this action individually and as a class action against Defendant.

335.    Plaintiff brings this action in accordance with Federal Rule of Civil Procedure 23 individually and on behalf of the following proposed Class and Subclass:

> **Santa Clara Valley Medical Center Class:** For the period August 25, 2018, to the present, all patients or prospective patients of Santa Clara Valley Medical Center or any of its affiliates who exchanged communications at Santa Clara Valley Medical Center's websites, including https://scvmc.scvh.org and any other

Santa Clara Valley Medical Center-affiliated website, including Santa Clara Valley Medical Center's patient portals.

**The Patient Subclass:** For the period August 25, 2018, to the present all patients of Santa Clara Valley Medical Centeror any of its affiliates and who exchanged communications at Santa Clara Valley Medical Center's websites, including https://scvmc.scvh.org and any other Santa Clara Valley Medical Center-affiliated website, including Santa Clara Valley Medical Center's patient portals.

336.     Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding over this action or appellate judge assigned to this case and any members of their staff and immediate families; (2) any jurors assigned to hear this case as well as their immediate families; (3) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers, and directors; and (4) Plaintiff's counsel and Defendant's counsel.

337.     Plaintiff and Class Members satisfy the numerosity, commonality, typicality, adequacy, and predominance requirements for suing as representative parties.

338.     **Numerosity:** The exact number of members of the Class is unknown and unavailable to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of thousands of individuals. The exact number of Class Members can be determined by review of information maintained by Defendant. The proposed class is defined objectively in terms of ascertainable criteria.

339.     **Predominant Common Questions:** The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class Members. Common questions for the Class include, but are not limited to, the following:

(a)     Whether Defendant violated Plaintiff's and Class Members' privacy rights;

(b)     Whether Defendant's acts and practices violated California's Confidentiality of Medical Information Act, CIVIL CODE §§ 56, *et seq.*;

(c)     Whether Plaintiff and the Class Members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement; and,

(d)     Whether Plaintiff and the Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

340.    **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Class. The claims of Plaintiff and the members of the Class arise from the same conduct by Defendant and are based on the same legal theories.

341.    **Adequate Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interest that is in conflict with the interests of the Class, and Defendant has no defenses unique to any Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and she has the resources to do so. Neither Plaintiff nor her counsel has any interest adverse to the interests of the other members of the Class.

342.    **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

343.    Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

# VIII. CLAIMS FOR RELIEF

## COUNT I—VIOLATIONS OF THE ELECTRONIC COMMUNICAITONS PRIVACY ACT ("ECPA") 18 U.S.C. § 2511(1) *ET SEQ.* UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE

344.    Plaintiff re-alleges and incorporates all preceding paragraphs.

345.    Plaintiff brings this claim on behalf of herself and all members of the Santa Clara Valley Medical Center Class against Defendant.

346.    The ECPA protects both sending and receipt of communications.

347.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

348.    The transmissions of Plaintiff's Personal Health Information to Santa Clara via Santa Clara's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

349.    The transmissions of Plaintiffs' Personal Health Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

350.    **Electronic Communications**. The transmission of Personal Health Information between Plaintiffs and Class Members and Santa Clara via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

351.    **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added). Santa Clara aided in the interception and disclosure of "contents" including

(a)     The parties to the communications;

(b)     The precise text of patient search queries;

(c)     Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

(d)     The precise text of patient communications about specific doctors;

(e)     The precise text of patient communications about specific medical conditions;

(f)     The precise text of patient communications about specific treatments;

(g)     The precise text of patient communications about scheduling appointments with medical providers;

(h)     The precise text of patient communications about billing and payment;

(i)     The precise text of specific buttons on Santa Clara's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

(j)     The precise dates and times when patients click to Log-In on Santa Clara's website(s);

(k)     The doctors that patients selected for review from drop down menus using Santa Clara's website;

(l)     The precise dates and times when patients visit Santa Clara's websites;

(m)    Information that is a general summary or informs third parties of the general subject of communications that Santa Clara sent back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

(n)     Any other content that Santa Clara has aided Facebook, Google, or other third parties in scraping from webpages or communication forms at its Web Properties.

352.   **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

353.   **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

       a.   Plaintiff's and Class Members' browsers;

       b.   Plaintiff's and Class Members' computing devices;

       c.   Plaintiff's and Class Mobiles' mobile applications;

       d.   Defendant's computer servers; and

       e.   The tracking pixels deployed by Defendant to effectuate the sending and acquisition of patient communications;

       f.   Internet cookies; and

       g.   Computer servers of third-parties to which Plaintiff's and Class Members communications were disclosed.

354.   Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Tracking Pixel imbedded and ran on its Website, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiff's and Class Members' electronic communications to third parties, including Facebook and Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.  18 U.S.C. § 2511(1)(c).

355.    Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Tracking Pixels deployed on its Website, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiff's and Class Members' electronic communications, for purposes other than providing health care services to Plaintiff and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.  18 U.S.C. § 2511(1)(d).

356.    Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the source code it deployed and ran on its web properties and mobile app, contemporaneously and intentionally redirected the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

357.    Defendant's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiff's and Class Members' regarding PII and PHI, treatment, medication, and scheduling.

358.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

359.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

360.     Defendant intentionally used the wire or electronic communications for marketing purposes to increase its profit margins. Defendant specifically used the Pixels to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

361.     Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

362.     Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Pixel tracking code.

363.     Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

364.     **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State – namely, violations of California state law, including California Civil Code § 56.10 which prohibits a health care provider from disclosing medical information without first obtaining an authorization and 42 U.S.C. § 1320d-6 which makes it a federal crime to disclose individually identifiable health information for commercial advantage, and invasion of privacy, among others.

365.     The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

366.     Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Personal Health Information does not qualify for the party exemption.

367.     Defendant's acquisition of patient communications that were used and disclosed to Facebook and Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and California including, among other things,

a. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

b. Violations of California Civil Code § 56.10 and California Civil Code § 56.36 for unauthorized disclosure of medical information;

c. Violation of California Civil Code § 56.101 which requires every health care provided to manage medical information in a manner that preserves the confidentiality of that information;

d. Violation of California Government Code § 815.6 for violating mandatory privacy duties imposed by California law protecting California citizens against the unauthorized disclosure of their medical information;

e. Violation California Civil Code § 1798.82 (the California Consumers Records Act) for Santa Clara's failure to notify its patients that it was regularly sharing their medical information with Facebook and Google;

f. Violation of California Civil Code § 1798.100 which prohibits businesses from collecting and using personal information without properly disclosing those uses to the public; and

g. Common law invasion of privacy.

368.    For example, under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

369.    The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

370.    Santa Clara's conduct violated 42 U.S.C. § 1320d-6 in that it:

a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

FOURTH AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1

2

    b.   Disclosed individually identifiable health information to Facebook and

         Google without patient authorization.

3      371.   Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C.

4  § 1320d-6 because Defendant's use of the Facebook and Google source code was for Defendant's

5  commercial advantage to increase revenue from existing patients and gain new patients.

6      372.   Under California Civil Code § 56.10 and California Civil Code § 56.36 a health

7  care provider is prohibited from disclosing patients' medical information without first obtaining

8  authorization.  Santa Clara violated Civil Code § 56.10 by disclosing Plaintiff's and Class

9  Members' medical information to Facebook and Google without their consent, including

10  information concerning their health status, medical diagnoses, treatment, and appointment

11  information, as well as Plaintiff's and Class Members' personally identifiable information.

12     373.   Santa Clara further violated Civil Code § 56.10 by knowingly and without

13  Plaintiffs' or Class Members' authorization inserted the _fbp, ga, and gid cookies on Plaintiffs'

14  and Class Members' computing devices.  The Meta Pixel source code that Santa Clara deployed

15  on its website is programmed to manipulate user's browsers so that their communications with

16  Santa Clara were automatically, contemporaneously, and surreptitiously sent to Facebook.

17  Specifically, when Plaintiff and Class Members visited Defendant's website for the first time, the

18  Meta Pixel source code that Defendant had installed on its website instructed Plaintiff's and Class

19  Member's browsers to begin sending duplicate GET and POST requests to Facebook every time

20  that Plaintiff and Class Members subsequently interacted with part of Defendant's website, such

21  as browsing new pages, filling out forms, or enter entering search terms in a search box.

22     374.   The _fbp, ga, and gid cookies that Santa Clara caused to be downloaded onto

23  Plaintiff's and Class Members' browsers furthered this scheme to surreptitiously monitor,

24  intercept, and disclose patients' communications by facilitating the identification and tracking of

25  Plaintiff and Class Members web activity by Facebook and Google.  Defendant knew or had

26  reason to know that the ga, and gid cookies would compromise Plaintiff's and Class Members'

27

28

computing devices by facilitating the transmission their personally identifying data and the content of their communications to Facebook, Google, and others.

375. Likewise, Santa Clara violated Civil Code § 56.101 in that it failed to maintain the confidentiality of its patients' medical information by intentionally deploying tracking technologies on its website and mobile app that shared patients' medical information with Facebook and Google.

376. Santa Clara further violated California Government Code § 815.6 by violating its mandatory duties under California law to protect its patients' medical information from unauthorized disclosures to third parties like Facebook and Google.

377. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their individually-identifiable patient health information on its Website, because it used its participation in these communications to improperly share Plaintiff's and Class Members' individually-identifiable patient health information with Facebook and Google, third-parties that did not participate in these communications, that Plaintiff and Class Members did not know were receiving their individually-identifiable patient health information, and that Plaintiff and Class Members did not consent to receive this information.

378. Defendant accessed, obtained, and disclosed Plaintiff's and Class Members' Personal Health Information for the purpose of committing the crimes and torts described herein because it would not have been able to obtain the information or the marketing services if it had complied with the law.

379. As such, Defendant cannot viably claim any exception to ECPA liability.

380. Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

        a. Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their individually-identifiable patient health information

(including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiff and the Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' individually-identifiable patient health information without providing any value or benefit to Plaintiff or the Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' individually-identifiable patient health information, such as understanding how people use its website and determining what ads people see on its website, without providing any value or benefit to Plaintiff or the Class Members;

d. Defendant failed to provide Plaintiff and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e. The diminution in value of Plaintiff's and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, test results, and appointments that Plaintiff and Class Members intended to remain private no longer private.

381.    Plaintiff and Class Members have also suffered irreparable injury from Defendant's unauthorized acts of interception and disclosure. Their personal, private, and sensitive data has been collected, viewed, accessed, stored, and used by Santa Clara and Facebook without their consent and has not been destroyed. Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights. Plaintiff continues to desire to search for health information on Santa Clara's website. Plaintiff will continue to suffer

harm if the website is not redesigned. If the website were redesigned to comply with applicable laws, Plaintiff would use the Santa Clara's website to search for health information in the future. Due to the continuing threat of injury, Plaintiff and Class Members have no adequate remedy at law, and Plaintiff and Class Members are therefore entitled to injunctive relief.

382.   As a result of Defendant's violation of the ECPA, Plaintiff and Class Members entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.   Based on the size of the anticipated class of Santa Clara patients (which numbers in the many thousands), damages are expected to be over the mandatory arbitration threshold of $150,000.

383.   Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

### COUNT II—VIOLATION OF CMIA CIVIL CODE § 56.101

384.   Plaintiff re-alleges and incorporates all preceding paragraphs.

385.   Plaintiff brings this claim on behalf of herself and all members of the Patient Subclass against Santa Clara Valley Medical Center.

386.   Civil Code § 56.101, subdivision (a) requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

387.   Any health care provider who "negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36."

388.   Santa Clara failed to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information contained therein because it disclosed to Facebook Plaintiff's and Subclass Members' sensitive medical information without consent,

including information concerning their health status, medical diagnoses, treatment, and appointment information, as well as personally identifiable information.

389.    Santa Clara's failure to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information was, at the least, negligent and violates Civil Code § 56.36 subdivisions (b) and (c).

390.    Accordingly, Plaintiff and Subclass Members may recover: (1) nominal damages of $1,000; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to 56.36(c); and (4) reasonable attorney's fees and other litigation costs reasonably incurred.

391.    In addition to statutory damages, Santa Clara's breach caused Plaintiff and Subclass Members, at minimum, the following damages:

(a)    Sensitive and confidential information that Plaintiff and Subclass Members intended to remain private is no longer private;

(a)    Santa Clara eroded the essential confidential nature of the doctor-patient relationship;

(b)    Santa Clara took something of value from Plaintiff and Subclass Members and derived benefit therefrom without Plaintiff's and Subclass Members' knowledge or informed consent and without sharing the benefit of such value;

(c)    Plaintiff and Subclass Members did not get the full value of the medical services for which they paid, which included Santa Clara's duty to maintain confidentiality; and

(d)    Santa Clara's actions diminished the value of Plaintiff and Subclass Members' personal information.

392.    Plaintiff and Subclass Members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT III—VIOLATION OF CMIA CIVIL CODE § 56.10

393.    Plaintiff re-alleges and incorporates all preceding paragraphs.

394.    Plaintiff brings this claim on behalf of herself and all members of the Patient Subclass against Santa Clara Valley Medical Center.

395.    Civil Code § 56.10, subdivision (a), prohibits a health care provider from disclosing medical information without first obtaining an authorization, unless a statutory exception applies.

396.    Santa Clara disclosed medical information without first obtaining authorization when it disclosed Plaintiff's and Subclass Members' sensitive medical information to Facebook without consent, including information concerning their health status, medical diagnoses, treatment, and appointment information, as well as personally identifiable information. No statutory exception applies. As a result, Santa Clara violated Civil Code § 56.10, subdivision (a).

397.    Santa Clara knowingly and willfully, or negligently, disclosed medical information without consent to Facebook for financial gain.

398.    Accordingly, Plaintiff and Subclass Members may recover: (1) nominal damages of $1,000; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to 56.36(c); (4) punitive damages pursuant to 56.35; and (5) reasonable attorney's fees and other litigation costs reasonably incurred.

399.    In addition to statutory damages, Santa Clara's breach caused Plaintiff and Subclass Members, at minimum, the following damages:

(a)    Sensitive and confidential information that Plaintiff and Subclass Members intended to remain private is no longer private;

(b)    Santa Clara eroded the essential confidential nature of the doctor-patient relationship;

(c)    Santa Clara took something of value from Plaintiff and Subclass Members and derived benefit therefrom without Plaintiff's and Subclass Members'

knowledge or informed consent and without sharing the benefit of such
value;

(d)     Plaintiff and Subclass Members did not get the full value of the medical
services for which they paid, which included Santa Clara's duty to maintain
confidentiality; and

(e)     Santa Clara's actions diminished the value of Plaintiff's and Subclass
Members' personal information.

400.    Plaintiff and Subclass Members also seek such other relief as the Court may deem
equitable, legal, and proper.

**COUNT IV—VIOLATION OF THE COMPREHENSIVE**
**COMPUTER DATA ACCESS AND FRAUD ACT**
**("CDAFA") CAL. PENAL CODE § 502**

401.    Plaintiff re-alleges and incorporates all preceding paragraphs.

402.    Plaintiff brings this claim on behalf of herself and all members of the Santa Clara
Valley Medical Center Class against Defendant.

403.    The California Legislature enacted the Comprehensive Computer Data Access and
Fraud Act, CAL. PENAL CODE § 502 ("CDAFA") to "expand the degree of protection . . . from
tampering, interference, damage, and unauthorized access to [including the extraction of data
from] lawfully created computer data and computer systems," finding and declaring that "the
proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of
unauthorized access to computers, computer systems, and computer data," and that "protection of
the integrity of all types and forms of lawfully created computers, computer systems, and
computer data is vital to the protection of the privacy of individuals . . ." CAL. PENAL CODE
§ 502(a).

404.    Under CDAFA, any person who "[k]nowingly accesses and without permission …
*uses* any data … or computer system in order to either (A) devise or execute any scheme or artifice

to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data" is "guilty of a public offense." CAL. PENAL CODE § 502(c)(1).

405.   Plaintiff's and the Class Members' devices on which they accessed the hospital or patient portals, including their computers, smart phones, and tablets, constitute computers or "computer systems" within the meaning of CDAFA. CAL. PENAL CODE § 502(b)(5).

406.   Defendant violated section 502, subsection (c)(1)(A) by knowingly using data obtained from Santa Clara's patients as part of a scheme to defraud and deceive patients into surrendering their Personal Health Information so that Santa Clara could then barter that information to Facebook in return for economic benefits.  Defendant violated section 502, subsection (c)(1)(B) by knowingly using data obtained from Santa Clara's patients to wrongfully obtain financial and other benefits. Santa Clara obtained benefits from Facebook, as well as Google and other third parties, by bartering patients' Personal Health Information to those companies.  Facebook obtained benefits by using Plaintiff's and the Class Members' information to sell targeted advertisements. Neither Plaintiff nor Class Members ever gave Defendant permission for Santa Clara to disclose their Personal Health Information to Facebook or any other third party.

407.   Defendant also violated section 502, subsection (c)(1)(B), of CDAFA by knowingly accessing without permission Plaintiff's and Class Members' devices in order to wrongfully obtain and use their personal data, including their sensitive medical information, in violation of Plaintiff's and Class Members' reasonable expectations of privacy in their devices and data.  Defendant achieved this by installing software code on Santa Clara's website that directed patients' browsers to send copies of their communications to Facebook, as well as Google and other third parties, without their consent. Defendant also placed the _fbp, _ga, and _gid cookies on Class Members' computing devices without consent. These cookies occupied storage space on Plaintiff's and Class Members' devices and used the resources of those devices without

authorization, usurping the devices' normal functions and re-directing them toward sending unauthorized communications.

408.    The Meta Pixel source code that Santa Clara deployed on its website is programmed to manipulate user's browsers so that their communications with Santa Clara were automatically, contemporaneously, and surreptitiously sent to Facebook.  Specifically, when Plaintiff and Class Members visited Defendant's website for the first time, the Meta Pixel source code that Defendant had installed on its website instructed Plaintiff's and Class Member's browsers to begin sending duplicate GET and POST requests to Facebook every time that Plaintiff and Class Members subsequently interacted with part of Defendant's website, such as browsing new pages, filling out forms, or enter entering search terms in a search box.  These surreptitious instructions harmed Plaintiff's and Class Members' computing devices by causing them to run slower.

409.    The _fbp, ga, and gid cookies that Santa Clara caused to be downloaded onto Plaintiff's and Class Members' browsers furthered this scheme to surreptitiously monitor, intercept, and disclose patients' communications by facilitating the identification and tracking of Plaintiff and Class Members web activity by Facebook and Google.  Defendant knew or had reason to know that the ga, and gid cookies would compromise Plaintiff's and Class Members' computing devices by facilitating the transmission their personally identifying data and the content of their communications to Facebook, Google, and others and taking up unnecessary space on Plaintiff's and Class Members' hard drives with data that only served to benefit Santa Clara, Facebook, and Google—not Plaintiff or Class Members.

410.    Defendant violated California Penal Code section 502, subsection (c)(2), by knowingly and without permission accessing, taking, copying, and making use of Plaintiff's and the Class Members' personally identifiable information, including their sensitive medical information as part of a scheme. Santa Clara sought to barter patients' Personal Health Information to Facebook, as well as Google and other third parties, in return for advertising

benefits, and Facebook sought to exploit Plaintiff's and Class Members' Personal Health Information to sell targeted advertising services

411.   Santa Clara violated California Penal Code section 502, subsection (c)(6) by knowingly and without permission providing or assisting Facebook, as well as Google and other third parties, with a means of accessing Plaintiff's and the Class Members' computer systems.

412.   The computers and mobile devices that Plaintiff and Class Members used when accessing Santa Clara's website all have and operate "computer services" within the meaning of CDAFA. Defendant violated §§ 502(c)(3) and (7) of CDAFA by knowingly and without permission accessing and using those devices and computer services, and/or causing them to be accessed and used, *inter alia*, in connection with Facebook's wrongful collection of such data.

413.   Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." Defendant violated § 502(c)(8) by knowingly and without permission introducing a computer contaminant via Meta Pixel embedded into the hospital website which intercepted Plaintiff's and the Class Members' private and sensitive medical information.

414.   Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

(a)   Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

(b)   Plaintiff's and Class Members' computers had less available storage space than they normally would have;

(c)   Plaintiff's and Class Members' computers worked more slowly than they normally would have;

(d)     Plaintiff and Class Members were forced to spend time and money to investigate and mitigate the contamination of their computing devices by Santa Clara;

(e)     Defendant eroded the essential confidential nature of the doctor-patient relationship;

(f)     Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

(g)     Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Santa Clara's duty to maintain confidentiality; and

(h)     Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

415.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

416.    Plaintiff and the Class Members seek compensatory damages in accordance with CAL. PENAL CODE § 502(e)(1), in an amount to be proved at trial, and injunctive or other equitable relief. Plaintiff continues to desire to search for health information on Santa Clara's website. She will continue to suffer harm if the website is not redesigned. If the website were redesigned to comply with applicable laws, Plaintiff would use Santa Clara's website to search for health information in the future.

417.    Plaintiff and Class Members are entitled to punitive or exemplary damages pursuant to CAL. PENAL CODE § 502(e)(4) because Defendant's violations were willful and Defendant is guilty of oppression, fraud, or malice as defined in CAL. CIVIL CODE § 3294.

1  418.  Plaintiff and the Class Members are also entitled to recover their reasonable
2  attorney's fees under § 502(e)(2).

3  **COUNT V—VIOLATION OF CAL. CIVIL CODE § 1798.82**

4  419.  Plaintiff re-alleges and incorporates all preceding paragraphs.

5  420.  Plaintiff Jane Doe brings this claim on behalf of herself and all members of the
6  Patient Subclass against Santa Clara Valley Medical Center.

7  421.  California Civil Code § 1798.82(a) provides that "[a] person or business that
8  conducts business in California, and that owns or licenses computerized data that includes
9  personal information, shall disclose a breach of the security of the system following discovery or
10 notification of the breach in the security of the data to a resident of California … whose
11 unencrypted personal information was, or is reasonably believed to have been, acquired by an
12 unauthorized person."

13 422.  For purposes of the statute, "personal information" means "[a]n individual's first
14 name or first initial and last name in combination with any one or more of the following data
15 elements, when either the name or the data elements are not encrypted: … (D) Medical
16 information."  CAL. CIVIL CODE § 1798.82.

17 423.  For purposes of the statute, "medical information" means "any information
18 regarding an individual's medical history, mental or physical condition, or medical treatment or
19 diagnosis by a health care professional."

20 424.  Any customer who is injured by a violation of the statute may institute a civil action
21 to recover damages. CAL. CIVIL CODE § 1798.84(b).  Further, any business that violates, proposes
22 to violate, or has violated this statute may be enjoined. CAL. CIV. CODE § 1798.84(e).

23 425.  Santa Clara failed to disclose to Plaintiff and the Subclass that it was regularly
24 collecting, transmitting, and sharing patients' unencrypted medical information with Facebook so
25 that Facebook could target them with advertising.  Along with its patients' medical information,
26 Santa Clara also disclosed its patients' first names (or first initial and last name) to Facebook via

encrypted data transmissions, including the unauthorized transmission of patients' Facebook IDs to Facebook, which permitted Facebook to link the medical information provided with the personal identities of Plaintiff and the Subclass Members.

426.   Santa Clara willfully, intentionally, and/or recklessly failed to provide the disclosures required by California Civil Code section 1798.82 as part of a scheme to barter Plaintiff's and Subclass Members' Personal Health Information to Facebook in return for access to the Meta Pixel tool.

427.   Plaintiff and Subclass Members conferred a benefit on Santa Clara in the form of valuable sensitive medical information that Santa Clara collected from Plaintiff and Subclass Members under the guise of keeping this information private. Santa Clara collected, used, and disclosed this information for its own gain, including for advertising purposes, sale, or trade for valuable services from Facebook and other third parties.  Santa Clara had knowledge that Plaintiff and Subclass Members had conferred this benefit on Santa Clara by interacting with its website, and Santa Clara intentionally installed the Meta Pixel tool on its website to capture and monetize this benefit conferred by Plaintiff and Subclass Members.

428.   Plaintiff and Subclass Members also conferred a benefit on Defendant by paying Santa Clara for health care services, which included Santa Clara's obligation to protect Plaintiff's and Subclass Members' Personal Health Information. Santa Clara was aware of receiving these payments from Plaintiff and Subclass Members and demanded such payments as a condition of providing treatment.

429.   Plaintiff and Subclass Members would not have used the Santa Clara's services, or would have paid less for those services, if they had known that Santa Clara would collect, use, and disclose this information to Facebook. The services that Plaintiff and Subclass Members ultimately received in exchange for the monies paid to Santa Clara were worth quantifiably less than the services that Santa Clara promised to provide.

430.     The medical services that Santa Clara offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Santa Clara disclosed that it would allow third parties to secretly collect Plaintiff's and Subclass Members' medical information without consent, neither Plaintiff, the Subclass Members, nor any reasonable person would have purchased healthcare from Santa Clara and/or its affiliated healthcare providers.

431.     Santa Clara unjustly retained those benefits at the expense of Plaintiff and Subclass Members because Santa Clara' conduct damaged Plaintiff and Subclass Members, all without providing any commensurate compensation to Plaintiff and Subclass Members.

432.     Plaintiff and Patient Subclass Members were damaged by Santa Clara's failure to inform them that their Personal Health Information was being shared with Facebook and other third parties, resulting in, at minimum, the following damages:

(i)     Sensitive and confidential information that Plaintiff and Patient Subclass Members intended to remain private is no longer private;

(j)     Santa Clara eroded the essential confidential nature of the doctor-patient relationship;

(k)     Santa Clara took something of value from Plaintiff and Patient Subclass Members and derived benefit therefrom without Plaintiff's and Patient Subclass Members' knowledge or informed consent and without sharing the benefit of such value;

(l)     Plaintiff and Patient Subclass Members did not get the full value of the medical services for which they paid, which included Santa Clara's duty to maintain confidentiality; and

(m)     Santa Clara's actions diminished the value of Plaintiff and Patient Subclass Members' personal information.

433.     Plaintiff also continues to desire to search for health information on Santa Clara's website. She will continue to suffer harm if Santa Clara does not make adequate disclosures regarding which third party marketing companies are receiving Plaintiff's and Patient Subclass Members' protected health information. Plaintiff and the Patient Subclass Members are therefore also entitled to injunctive relief requiring Santa Clara to comply with CAL. CIV. CODE § 1798.82.

### COUNT VI – VIOLATION OF CALIFORNIA GOVERNMENT CODE § 815.6

434.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth here and brings this claim individually and on behalf of the Santa Clara Valley Medical Center Class against Defendant.

435.     Pursuant to California Government Code § 815.6, when a public entity like Santa Clara is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is "liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty.

436.     As set forth in the paragraphs above, Santa Clara was subject to at least the following mandatory duties provided by California and Federal law:

      a.  42 U.S.C. § 1320d-6, which imposes mandatory duties prohibiting healthcare providers from sharing patients' protected health information for commercial gain;

      b.  45 C.F.R. § 164.508 which imposes mandatory duties prohibiting  health care providers like Santa Clara from using or disclosing protected health information without an a valid authorization;

      c.  45 C.F.R. § 164.502 which imposes mandatory duties prohibiting healthcare providers from disclosing protected health information without authorization if the healthcare provider "directly or indirectly receives

remuneration from or on behalf of the recipient of the protected health information in exchange for the protected health information";

d.  California Civil Code § 56.10 which imposes mandatory duties prohibiting the unauthorized disclosure of medical information;

e.  California Civil Code § 56.101 which imposes mandatory duties requiring every health care provided to manage medical information in a manner that preserves the confidentiality of that information;

f.  California Civil Code § 1798.82 (the California Consumers Records Act) which imposes a mandatory duty for a business in California to disclose breaches of its security system following the discovery that unauthorized persons have received a California resident's personal information; and

g.  California Civil Code § 1798.100 which prohibits businesses from collecting and using personal information without properly disclosing those uses to the public;

h.  California Civil Code §§ 1709 and 1710 which impose mandatory duties to refrain from willfully deceiving others with the intent to induce them to alter their position to their injury or risk; and

i.  18 U.S.C. § 2510 et seq. which imposes a mandatory duty for entities like Santa Clara to refrain from intercepting, using, or disclosing individuals' communications without consent where the interceptions were made for the purpose of committing a crime or tort in violation of the Constitution or laws of the United States or of any State.

437.   Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Santa Clara via its website and the communications platforms and services therein.

438.   Plaintiff and Class Members communicated sensitive and protected medical information and personally identifiable information that they intended for only Santa Clara to receive and that they believed Santa Clara would keep private.   Defendant deployed source code on Santa Clara's website that surreptitiously instructed Plaintiff's and Class Members' browsers to share their Personal Health Information with Facebook, as well as Google and other third parties.

439.   Santa Clara's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' privacy.

440.   Santa Clara interfered with Plaintiff's and Class Members' privacy rights when they implemented technology that surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members' confidential information to Facebook, Google, and other third parties.

441.   Santa Clara also interfered with Plaintiff's and Class Members' rights when it intentionally deceived them about what it would do with their medical information by making misleading disclosures to the public on its website, including suppressing the fact that it had deployed tracking technologies on its website that shared patients' data with Facebook and Google and making promises that it would protect patient privacy without any intention of performing those promises.

442.   Santa Clara also breached its obligations to patients in multiple other ways, including (1) failing to obtain their consent to disclose their private information to Facebook and other third parties, (2) failing to adequately review its marketing programs and web-based technology to ensure its website was safe and secure, (3) failing to remove or disengage software code that was known and designed to share patients' private information with third parties, (4) failing to take steps to block the transmission of Plaintiff's and Class Members' private information to Facebook and other third-party advertising companies, (5) failing to warn Plaintiff and Class Members that Defendant was routinely bartering their private information to Facebook

via the Meta Pixel, and (6) otherwise ignoring Defendant's common-law and statutory obligations to protect the confidentiality of patient's protected health information.

443.    Santa Clara further failed to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information contained therein because it disclosed to Facebook and Google Plaintiffs' and Class Members' sensitive medical information without consent, including information concerning their health status, medical diagnoses, treatment, and appointment information, as well as personally identifiable information.

444.    Defendant's failure to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information was, at the least, negligent and violates the mandatory duties imposed by Civil Code section 56.101.

445.    Plaintiff and Class Members have suffered injury because of Defendant's conduct. Their injuries include invasion of privacy, overpayment for medical services, loss of the value of their personal information, and the continued and ongoing risk of irreparable harm from the disclosure of their most sensitive and personal information

446.    Plaintiff and Class Members had a reasonable expectation of privacy based on the sensitive nature of their communications. Plaintiff and Class Members have a general expectation that their communications regarding health and finances will be kept confidential. Santa Clara's disclosure of Private Information and Facebooks interception of that information coupled with individually identifying information is highly offensive to the reasonable person.

447.    Plaintiff and Class Members also had a reasonable expectation of privacy that their communications, identity, health information, and treatment data would remain confidential and that Defendant would not install surreptitious wiretapping technology on Santa Clara's website to secretly transmit their communications to third parties, including Facebook, as well as Google and other third parties.

448.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including the specific harms that the mandatory duties set forth above were

designed to prevent.  Among other things, as a consequence of Santa Clara's failure to comply with its mandatory duties, (1) Plaintiff's and Class Members' medical information was disclosed to Facebook and Google without their consent; (2) Plaintiff's and Class Members' protected health information was exploited for commercial gain without their consent; (3) Plaintiff's and Class Members' privacy continued to be violated long after Santa Clara became aware of the unauthorized disclosures caused by tracking technologies because Santa Clara refused to provide notice of the data breach that its deployment of these tracking technologies had caused; (4) Plaintiff and Class Member's had their protected health information disclosed to third parties because Santa Clara failed to take reasonable measures to protect that information against unlawful disclosure; and (5) Plaintiff and Class Members were tricked into providing their protected health information to Facebook and Google because Santa Clara failed to provide legally mandated notice that it would share patients' medical information with third parties via tracking technologies it had deployed on its website and mobile app.

449.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

450.    Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of its intrusions upon Plaintiff's and Class Members' privacy.

451.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

452.    Plaintiff also seeks such other relief as the Court may deem just and proper.

### IX. DEMAND FOR JURY TRIAL

453.    Plaintiff hereby demands a trial by jury on all issues so triable.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of herself and the proposed Class and Subclass respectfully requests that the Court enter an order:

A.   Certifying the Class and Subclass and appointing Plaintiff as the Class and Subclass representative;

B.   Appointing the law firms of Ahmad, Zavitsanos, & Mensing PLLC and Caddell & Chapman as proposed interim class counsel;

C.   Finding that Defendant's conduct was unlawful, as alleged herein;

D.   Awarding such injunctive and other equitable relief as the Court deems just and proper;

E.   Awarding Plaintiff and the Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

F.   Awarding Plaintiff and the Class Members pre-judgment and post-judgment interest;

G.   Awarding Plaintiff and the Class Members reasonable attorneys' fees, costs, and expenses; and

H.   Granting such other relief as the Court deems just and proper.

Dated August 9, 2024                           Respectfully submitted,

                                        By: */s/ Michael A. Caddell*
                                             Michael A. Caddell (SBN 249469)
                                             mac@caddellchapman.com
                                             Cynthia B. Chapman (SBN 164471)
                                             cbc@caddellchapman.com
                                             Amy E. Tabor (SBN 297660)
                                             aet@caddellchapman.com
                                             CADDELL & CHAPMAN
                                             628 East 9th Street
                                             Houston TX 77007-1722
                                             Tel.: (713) 751-0400
                                             Fax: (713) 751-0906

                                             Foster C. Johnson (SBN 289055)
                                             Joseph Ahmad*
                                             Nathan Campbell*
                                             AHMAD, ZAVITSANOS, & MENSING, PLLC
                                             1221 McKinney Street, Suite 2500
                                             Houston TX 77010
                                             (713) 655-1101
                                             fjohnson@azalaw.com
                                             jahmad@azalaw.com
                                             ncampbell@azalaw.com

                                             Samuel J. Strauss*
                                             Raina C. Borrelli*
                                             STRAUSS BORRELLI, PLLC
                                             980 N. Michigan Ave., Suite 1610
                                             Chicago, IL 60611
                                             Telephone: (872) 263-1100
                                             Facsimile: (872) 263-1109
                                             sam@straussborrelli.com
                                             raina@straussborrelli.com

                                             * Motions for Admission to be filed

                                             *Attorneys for Plaintiff*

1

**CERTIFICATE OF SERVICE**

2

3      I hereby certify that on August 9, 2024, this document was electronically filed via the

4   Court's CM/ECF system and will be served on all counsel of record.

5

6                                                        *s/Michael A. Caddell*
                                                         Michael A. Caddell
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28